Whitaker, Judge,
delivered the opinion of the court:
This is a suit to recover income taxes for the years 1944 and 1945. Plaintiff is entitled to recover if he is entitled to carry back to those years a loss sustained by him in 1946 due to the charging off in that year of a bad debt in the sum of $345,746.28. He is entitled to do so if it was a loss “attributable to the operation of a trade or business regularly carried on by the taxpayer.”
This indebtedness, which turned out to be a bad debt, was incurred in this way:
Plaintiff was a member of the brokerage firm of Chas. D. Barney & Company, and in its successor partnership, Smith, Barney & Company. The business of these firms on the New York Stock Exchange prior to 1929 had been handled by .Alan Corey, and occasionally by other brokers. The business of Chas. D. Barney & Company grew to such an extent, however, that Mr. Corey was unable to give all of it his own personal attention and he was not able to adequately *587 supervise the activities of other brokers who were called in from time to time to handle some of it. This led plaintiff to conclude that it would be desirable to secure a broker who would give his first attention to the partnership business, and who would have the time to handle all of it. He approached a cousin of his, Henry M. Watts, Jr., a customers’ man in the brokerage business of Robert Glendinning & Co., at Philadelphia, with the proposition that plaintiff would lend him the money to purchase a seat on the New York Stock Exchange, with the understanding that Watts would devote his first attention to the business on the Exchange of Chas. D. Barney & Company. Watts consented, and plaintiff borrowed from the Irving Trust Company the sum of $442,500.00, which he turned over to Watts for the purchase of a seat on the Exchange. This purchase was made by Watts, and Watts thereafter, either through himself or through the partnership which he later formed, devoted his first attention to the business of the partnership of Chas. D. Barney & Company, and its successor, Smith, Barney & Company. No part of the partnership’s business on the Stock Exchange was handled by any of the partners after Watts took it over.
Plaintiff borrowed this money himself because the partnership was unable, or it was deemed inadvisable for it to borrow the money for this purpose, and plaintiff was the only member of the partnership who had sufficient assets to secure the loan. The entire transaction was, however, carried on with the concurrence of the other partners. Plaintiff’s interest in acquiring this seat for Watts was solely to advance the interests of the partnership of Chas. D. Barney & Company. It was not purchased to promote plaintiff’s own individual interest, except as his interest would be promoted by the promotion of the partnership interest.
It is, of course, not unusual for a partner to pledge his individual assets to secure a partnership debt, or to borrow money for the partnership, nor is it unusual for an officer of a corporation to do so. This is done because the promotion of the partnership’s interest, or the corporation’s interests, promotes the interests of the individual.
Following the making of the loan at the Irving Trust Company, the value of the collateral which plaintiff had *588 hypothecated to secure the loan greatly decreased, and the bank finally called on plaintiff to pay the loan, which he did with funds borrowed from the partnership, but which were later repaid to the. partnership by plaintiff. . ,
Watts was unable to repay plaintiff, and finally in 1946 he settled his indebtedness to plaintiff by the payment to him of the sum of $82,251.88. The balance of $345,746.28 was charged off as a bad debt in the year 1946. This was allowed by the Commissioner of Internal Revenue in computing plaintiff’s income taxes for 1946, but he has disallowed plaintiff’s claim of his right to carry back to the years 1944 and 1945 the resulting loss in 1946.
Plaintiff’s right to carry back this loss depends upon the proper construction of section 122 (d) (5) of the Internal Revenue Code, 26 U. S. C. (1946 Ed.). Section 122 (a) defines “net operating loss” to mean “the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).” Subsection (d) provides:
The exceptions, additions and limitations referred to in subsections (a), (b),and (c) shall be as follows:
* * * * *
(5) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. * * *
Plaintiff is not entitled to the deduction of this bad debt if it was “not attributable to the operation of a trade or business regularly carried on” by him.
Plaintiff’s business was a brokerage business carried on through the instrumentality of the brokerage firm of Chas. D. Barney & Company and its successor Smith, Barney & Company. Plaintiff borrowed the money in order to promote the business of this partnership, and, therefore, his own business, and it would, therefore, seem plain that the loss sustained by plaintiff on account of this bad debt was a loss attributable to the carrying on of his business through the instrumentality of the brokerage firm of Chas. D. Barney & Company and its successor.
*589 Plaintiff’s sole purpose in borrowing the money was to promote the interests of this partnership. Plaintiff’s business was carried on through the partnerships, and the loan therefore was made to promote plaintiff’s business. The loss of a portion of the loan was, therefore, directly attributable to the carrying on of plaintiff’s business.
It is difficult to see how plaintiff could be entitled to the deduction of this bad debt from his income in 1946 as a loss incurred in his business, as the Commissioner of Internal Revenue held, and not be entitled to deduct it in computing his loss for carry-back purposes, since all that plaintiff need show to be entitled to the carry-back is that the loan which became a bad debt was “attributable to the operation” of his trade or business.
We are of the opinion plaintiff is entitled to recover. See Pierce v. Commissioner, 18 B. T. A. 447; Siarto v. Commissioner, 62 T. C. M. 3; aff’d. 171 F. 2d 293; Brown v. Commissioner, 92 T. C. M. 1054.
The carry-back of a part of this loss to 1944 results in an overassessment for that year in the amount of $69,086.64. The carry-back of the remainder of the loss to 1945 results in an overassessment for that year of $28,439.48.
Plaintiff therefore is entitled to recover of the defendant $69,086.64 for 1944, and $28,439.48 for 1945, or a total of $97,526.12, plus interest as provided by law. Judgment will be entered accordingly.
Howell, Judge; MaddeN, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner George H. Foster, and the briefs and argument of counsel, as follows:
1. Plaintiff, Charles B. Harding, is a citizen of the United States with his business address in New York City and his residence in Rumson, New Jersey. Plaintiff, at all times material hereto, has been actively engaged in the securities business.
2. The plaintiff became a partner in the firm of Chas. D. Barney & Company in 1925 and was managing partner from *590 1929 to 1938. This partnership was engaged in the brokerage business with its home office in New York City. Thereafter, the plaintiff became a partner in a successor firm, Smith, Barney & Company, in which firm he has been senior partner since January 1, 1944. Except for his activities as a partner in the above-mentioned partnerships, plaintiff has not been engaged in any other brokerage business since 1925. Plaintiff served in the United States Navy from 1941 to 1945, retaining, however, his interest in Smith, Barney & Company, and during that period he consulted from time to time with the partners on major business matters. For the first year of his service he was stationed in New York, and for the remaining time he was stationed at Arlington, Virginia.
3. Chas. B. Barney & Company was, and Smith, Barney & Company is, a limited partnership, and neither has at any time been a corporation or separate taxpaying entity. The business conducted by the partners in these firms during all times material hereto has consisted of (a) the taking and execution of orders for the purchase and sale of securities on the New York Stock Exchange, upon other exchanges, and in the over-the-counter market, and (b) investment banking.
4. Purchases and sales on the New York Stock Exchange may be executed only by members of the Exchange. The execution of such orders on the Exchange on behalf of Chas. D. Barney & Company was handled in the beginning of 1929 largely by Mr. Alan Corey, a partner in the firm who was a member of the Exchange.
5. During the period 1925 to 1929 there was a substantial increase in the volume of business transacted on the Stock Exchange on behalf of Chas. D. Barney & Company. This increase was caused by the generally higher level of stock market trading during this period; the extension of the firm’s activity to include a greater number of small and medium size investors in addition to the relatively few wealthy investors that had previously constituted its clientele, the establishment of branch offices in cities outside of New York and Philadelphia, and the development of a wire service for correspondent brokerage houses that did not have personal representation on the Exchange.
*591 6. By 1929 the volume of business being done on the Stock Exchange on behalf of Chas. D. Barney & Company had become so heavy that it became impossible for Mr. Corey either to execute all the orders himself or to exercise adequate supervision over the four or five outside brokers who were from time to time employed to execute orders which he could not handle.
7. The securities brokerage business conducted by Chas. D. Barney & Company was suffering in early 1929 because the outside brokers upon whom the firm was becoming increasingly dependent for the execution of orders were primarily concerned with increasing their volume of orders rather than safeguarding the customers’ interests.
8. The proper handling of Stock Exchange orders demands on the part of the floor representative, or broker, an exercise of judgment such as to assure the customer, on whose behalf the order is executed, speedy completion of the transaction and the best price obtainable. A most important factor in the execution of orders is the discretion lodged in the broker on orders covering more than 100 shares. Under the rules of the Exchange, a broker has discretion either to make the transaction at the market price, accepting outstanding bids or offers, as the case might be, or to make a bid or offer on behalf of the customer in the hope of obtaining better terms than those prevailing at the moment.
9. Among plaintiff’s responsibilities as managing partner of Chas. D. Barney & Company in 1929 was supervision of the execution of orders on the Stock Exchange. In order to enable him to exercise more intelligent supervision over this important part of the firm’s operations, the firm in March 1929 purchased a seat on the Exchange in plaintiff’s name and he went on the floor for a few months to become familiar with actual trading operations and conditions. An additional reason for the purchase of the seat at this time was to safeguard against the absence from the floor or death of Mr. Corey, who was the only partner owning a seat on the Exchange and whose absence for any reason would have deprived the firm of the opportunity to earn commissions.
*592 10.Previous to the purchase of the seat in plaintiff’s name, plaintiff discussed with the other partners the need of additional representation on the floor of the Stock Exchange. He decided that one solution to the problem was to have one or more brokers on the floor of the Stock Exchange who were responsible to the partnership for the major portion of their business and who would devote such time as was necessary to the business of the partnership and whose services would be available at all times. Plaintiff then approached Henry M. Watts, Jr., a cousin of his, whom he knew to be a man of integrity and dependability, who was interested in going on the Exchange as a floor broker. Watts at that time was a customers’ man in the brokerage business of Robert Glen-dinning'& Company at Philadelphia where he had been employed for approximately three years, and plaintiff thought this experience would be helpful. He suggested to Watts that he would lend him the money to buy a seat on the Exchange or he would purchase a seat personally and register it in Watts’ name, with the purpose of having Watts devote all the time that was necessary to handle the business of the partnership of Chas. D. Barney & Company, or its successor, on the floor of the Exchange.
11. Watts decided to accept the offer of a loan from plaintiff to purchase a seat on the Exchange, rather than making use of a seat purchased and owned by plaintiff. Accordingly, plaintiff lent Watts $442,500, which was the price at that time of a seat on the Exchange, and both signed a subordination agreement in accordance with the rules of the Exchange on February 28,1929, by the terms of which Watts acknowledged his indebtedness to plaintiff in that amount, with interest at 6% per annum.
12. The funds loaned to Watts were obtained by plaintiff from the Irving Trust Co., New York City. In order to obtain the loan, plaintiff was required to post listed securities of substantial value as collateral. He paid interest on that loan and posted additional collateral during the first few years of the loan. Later the value of the collateral fell sharply and plaintiff was required to pay off the loan. To do this, he borrowed funds from the firm of Chas. D. Barney & Company, which he subsequently repaid.
*593 13. Watts applied tbe funds borrowed from plaintiff to the purchase of a seat on the New York Stock Exchange. As soon as the purchase was consummated, Watts moved his business office from Philadelphia to New York and commenced to function on the floor of the Exchange as a representative of Chas. D. Barney & Company. From that time through the final settlement of the loan from plaintiff in 1946 (except for a period of service in the United States Navy) Watts continued to act as floor broker on the Exchange for the firms of Chas. D. Barney & Company and its successor, Smith, Barney & Company.
14. Mr. Henry Butler, a partner in Chas. D. Barney & Company, sold his seat on the Exchange in 1929. Thereafter, no one of the partners in Chas. D. Barney & Company owned a seat on the Exchange, and Watts handled practically all of the business of Chas. D. Barney & Company on the Exchange as floor brokers until 1930, when Mr. Corey sold his seat on the Exchange. Watts worked under his direction. Upon Mr. Corey’s retirement from the Exchange, Watts joined with another broker to form a firm known as Mitchell, Watts & Co., which assumed full responsibility for the execution of the Stock Exchange business of Chas. D. Barney & Company. The partners concluded that the handling of orders on the floor of the Exchange was essentially a service function that could best be performed not by one of the partners but by someone unequivocally responsible to all persons in authority in the firm, whether they be senior partners, junior partners or branch managers. Also, by this arrangement the partners could more profitably devote their efforts to handling the broader investment and financial interests of clients rather than trading on the Exchange throughout the day. Watts’ firm took over the employees, desk, office space and telephone equipment previously used by Mr. Corey, and thereafter Chas. D. Barney & Company made use of Watts’ firm for execution of its orders. No member of Chas. D. Barney & Company thereafter actively traded on the floor of the Exchange.
15. At no time during the period here involved did the partnership of Chas. D. Barney & Company, or the successor partnership of Smith, Barney & Company, have any written *594 contract with. Watts or bis firm to handle the partnership orders on the Stock Exchange. The partnership could have canceled the arrangement at any time; it was free to give orders to other brokers and did so when it was necessary.
16. Plaintiff’s capital interest in Chas. D. Barney & Company at the time of this loan was $600,000, a little less than a 5% share in the partnership. The firm had been founded by plaintiff’s grandfather, and his family continued to hold a substantial interest in it. Plaintiff, at the time of the loan to Watts, anticipated receipt of substantial funds from the estate of his father who had died in January 1929, whereas most of the assets of plaintiff’s thirteen partners in Chas. D. Barney & Company were tied up in the capital of the firm.
17. For the first few years after Watts purchased a seat on the Exchange, he devoted full time to the execution of orders for Chas. D. Barney & Company. Thereafter, as the size of his firm grew, orders for brokerage firms other than Chas. D. Barney & Company, and later Smith, Barney & Company, have been handled. In recent years between 60% and 70% of the total volume of business done by Watts’ firm has been for Smith, Barney & Company. In 1946 the total commissions received by Watts’ firm from Smith, Barney & Company buisness was $80,000.
18. It is a customary practice in the securities brokerage business for large firms to transact some or all of their Stock Exchange business through one or more outside brokers who are not members of the firm, and for firms, or individuals who are members of firms, to help finance the purchase of Stock Exchange seats for outside brokers.
19. After Watts purchased his Stock Exchange seat and began to handle orders for the partnership, the servicing of the partnership orders on the floor of the Exchange was greatly improved. Watts’ use of this seat enabled Chas. D. Barney & Company and the successor partnership to serve their clients in an effective manner and it enabled Watts to become a valuable source of consultation and advice on market problems for the partnerships.
20. Watts made substantial payments on the loan during the first two years after it was made. Thereafter, due to the *595 depression, the falling off in the level of volume of stock market activity, and high income taxes, he was unable to make payments equal to the interest charges, and at December 31, 1940, the balance of the indebtedness stood at $427,998.16. Interest charges were adjusted on the loan from time to time to correspond to the market rate. No payments were made on the loan during the years 1941 to 1945, inclusive, and no interest was paid during this period. During much of this time, Watts was serving in the United States Navy. Finally, in 1946, the balance of his indebtedness to plaintiff was settled by a cash payment by Watts of $82,251.88. This represented approximately the fair market value of an Exchange seat at the time of the settlement in 1946. In order to make this payment, Watts borrowed $42,000 and divested himself of every business asset except his Stock Exchange seat to obtain the required remaining sum of approximately $40,000. The $345,746.28 balance of the indebtedness became worthless in 1946.
• 21. Plaintiff filed a joint income tax return with his wife, Mrs. Marian C. Harding, for the taxable year 1946. This return disclosed a net loss of $188,736.01 in the computation of which a deduction was claimed in the amount of $345,746.28 on account of the unpaid balance of the loan made by plaintiff to Watts. Schedule E of the return for 1946 is as follows:
SCHEDULE E.-INCOME FROM PARTNERSHIPS & TRUSTS

Partnerships

Smith, Barney & Co., 14 Wall Street, New York 5, N. Y_ $156,243. 97 Charles B. Harding, Wm. Barclay Harding, Catharine Harding Tailer & Laura Harding, 14 Wall Street, New York 5, N. Y_ (926.21)
(Group ownership of property — Net Loss) Business bad debt loss — Henry M. Watts, Jr. (See separate schedule)--- (345,746. 28)

Trusts

Joseph H. Choate, Jr., Trustee u/d of Marion C. Harding, 44 Wall Street, New York 5, N. Y_ 6,293. 49
Total,_ (184,135.03)
Amounts in parenthesis shown in red.
*596 22. The Internal Revenue Agent in Charge for the Second New York District by letter dated April 6,1949, proposed to disallow the deduction claimed for the year 1946 on account of the bad debt loss in the amount of $345,746.28, stating that the bad debt was “held to be nonbusiness.” Thereafter, following a protest filed by the taxpayer and a conference thereon, the Revenue Agent in Charge, on October 19, 1949, advised plaintiff that the return for the year 1946 had been accepted as filed. This final conclusion of October 19, 1949, that the bad debt deduction be allowed in full was based upon the fact that the loss was proximate to the plaintiff’s business, although it did not arise out of any business he was operating.
23. Plaintiff duly filed with the Collector of Internal Revenue for the Second District of New York his Federal income tax return (on a separate basis) for the calendar year, 1944, and paid income taxes for that year in the total amount of $69,086.64 plus interest on a deficiency. No deduction was claimed by plaintiff on his 1944 return on account of any net operating loss carry-back from 1946. On January 28, 1948, the plaintiff filed with the Collector of Internal Revenue for the Second New York District within the time prescribed by law a claim for refund of the total amount of income taxes paid by him for the year 1944, together with interest thereon as provided by law. The ground on which this claim was based was that the bad debt loss of $345,746.28 suffered by plaintiff in 1946 could be carried back pursuant to the provisions of Section 122 of the Internal Revenue Code to apply against plaintiff’s income in the two preceding years, 1944 and 1945. On December 13, 1949, the Commissioner of Internal Revenue notified the plaintiff by registered mail that his claim for refund of income taxes for the year 1944 was disallowed.
24. Plaintiff duly filed with the Collector of Internal Revenue for the Second District of New York his Federal income tax return (on a separate basis) for the calendar year 1945 and paid incomes taxes for that year in the total amount of $120,281.04 plus interest on a deficiency. No deduction was claimed by plaintiff on his 1945 return on account of any net *597 operating loss carry-back from 1946. On October 31, 1949, the plaintiff filed with the Collector of Internal Bevenue for the Second New York District, within the time prescribed by law, a claim for refund of income taxes for 1945 in the amount of $28,334.68, together with interest thereon as provided by law. The ground on which this claim was based was the same as that set forth in the claim for refund for 1944, referred to in Finding 23 above. On June 22,1950, the Commissioner of Internal Bevenue notified the plaintiff by registered mail that his claim for refund of $28,334.68 in income taxes for the year 1945 was disallowed.
25. The unpaid balance of the debt owed plaintiff by Watts of $345,746.28 was attributable to the operation of a trade or business regularly carried on by the plaintiff, and the net operating loss for 1946 of the plaintiff and his wife, Mrs. Marian C. Harding, after taking into account the adjustments prescribed in Section 122 (d) of the Internal Bevenue Code, was $167,449.17. The full amount of this net operating loss was incurred by the plaintiff since the gross income of his wife, Mrs. Marian C. Harding, for 1946 exceeded her deductions for that year.
26. The carry-back of such loss to 1944, pursuant to the provisions of section 122 of the Internal Bevenue Code, results in an over-assessment for 1944 in the amount of $69,-086.64, together with interest thereon as provided by law.
27. The carry-back of such loss to 1945, after first applying such carry-back against his 1944 net income, pursuant to the provisions of section 122 of the Internal Bevenue Code, results in an overassessment for 1945 in the amount of $28,-439.48, together with interest thereon as provided by law.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the United States ninety-seven thousand five hundred twenty-six dollars and twelve cents ($97,526.12), with interest as provided by law.