**UNITED STATES of America,
Appellant,**

v.

**H. F. KEELER and Alice H. Keeler,
his wife, Appellees.**

**No. 17359.**

United States Court of Appeals
Ninth Circuit.

Sept. 20, 1962.

Rehearing Denied Oct. 26, 1962.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner and Myron C. Baum, Attys., Dept. of Justice, Tax Div., Washington, D. C., Brockman Adams, U. S. Atty., and Joseph C. McKinnon, Asst. U. S. Atty., Seattle, Wash., for appellant.

Rosling, Williams, Lanza & Kastner, DeWitt Williams and William D. Cameron, Seattle, Wash., for appellees.

Before MERRILL and BROWNING, Circuit Judges, and MURRAY, District Judge.

MURRAY, District Judge.

H. F. Keeler (hereinafter referred to as the taxpayer) and his wife, Alice H. Keeler,[1] brought this action in the district court to recover income taxes paid by them for the year 1955 as a result of the refusal of the Commissioner of Internal Revenue to allow in full certain losses as deductions in the computation of their income. The case was tried in the district court before a jury, and the district court directed a verdict allowing taxpayer a deduction of $88,588.90 in full as a business bad debt under the provisions of § 166 of Title 26, U.S.C.A. The district court refused to allow taxpayer a further deduction of $13,694.99 in full as a loss sustained in a transaction entered into for profit or a loss related to his business within the meaning of § 165 of Title 26, U.S.C.A. From the allowance of the $88,588.90 deduction in full, the government appealed, and from the refusal to allow the $13,694.99 deduction in full, the taxpayer cross appealed. Jurisdiction of the district court is conferred by 28 U.S.C. § 1346 and § 1402, and jurisdiction of the appeal and cross appeal is conferred on this court by 28 U.S.C. § 1291.

The appeal and cross appeal will be treated separately herein, although the same factual background is relevant to both. This background was presented through an agreed statement of facts supplemented by testimony and exhibits, and the facts which are largely undisputed, are as follows:

Taxpayer was engaged in the industrial laundry business in and around Seattle, Washington. He started in this business on a small scale in 1920, and gradually built a substantial business. At the times material here the business was conducted under the name of Overall Cleaning and Supply Company, a co-partnership of which taxpayer owned and controlled 82.5%, the remaining 17.5 percent being owned by two elderly persons.

In 1953, plaintiff, together with one Joseph W. Smith, who controlled Northwest Laundry Company, a Portland, Oregon, corporation engaged in the industrial laundry business, and one Henry Hoffman, who was also engaged in the industrial laundry business in Milwaukee, Wisconsin, formed Northern Industrial Laundries, Ltd., hereinafter referred to as Northern, a corporation under

---

[1] The wife was joined as a plaintiff and thereafter as an appellee only because a joint income tax return was filed by the Keelers in 1955, the year involved. The losses involved were the separate losses of H. F. Keeler, the husband.

the laws of Province of Ontario, Canada. Northern was created to, and did, engage in the same type of industrial laundry business in Toronto, Ontario, as taxpayer, Joseph W. Smith's corporation and Henry Hoffman were engaged in their respective locations. Out of a total investment in Northern of $610,000 in common and preferred stock and debentures, taxpayer invested $95,770.00. The other shareholders in Northern, constituting a majority both in numbers and amount invested had no connection with taxpayer's Seattle laundry business.

At about the time of the incorporation of Northern, taxpayer, Hoffman and Smith encouraged a number of persons referred to as the Hooker group to purchase stock and debentures of Northern by orally promising to reimburse such group for any loss they might sustain by reason of their investment. Taxpayer's wife, Alice H. Keeler, was included in the Hooker group. The investment of the Hooker group in Northern amounted to $71,980.00.

Northern commenced operations on January 1, 1954, in Toronto. On January 7, 1954, taxpayer, Smith and Hoffman executed a guaranty securing to the Canadian Bank of Commerce payment by Northern of a line of credit or loan up to the amount of $150,000. Thereafter, taxpayer and Smith released Hoffman from the guaranty to Canadian Bank of Commerce.

From the start, Northern operations were unsuccessful financially, and taxpayer and Smith's Northwest Industrial Laundry Company supplied Northern with additional working capital in the form of cash advances, payment of invoices and credit sale of used equipment. At the time of the compromise settlement hereinafter mentioned, the advances made to Northern by taxpayer totalled $132,336.11, and there is no dispute but that those advances represent loans and credit from taxpayer to Northern and for which Northern was indebted to taxpayer.

In October, 1954, Northern executed a $250,000 mortgage to taxpayer and Smith's Northwest Industrial Laundry Company to secure certain of the advances previously made by them and also their guaranty to the Canadian Bank of Commerce. In order to secure an extension of the Canadian Bank of Commerce's then existing loan to Northern, the mortgage was assigned by taxpayer and Northwest Industrial Laundry Company to the Canadian Bank of Commerce. On the same day the mortgage was issued, Northern executed a demand promissory note to taxpayer in the sum of $205,000, and a like note in the same amount to Northwest Industrial Laundry Company. These two notes represented the total amount of the advances made by taxpayer and Northwest Industrial Laundry Company to Northern and also the amount of the guaranty.

Northern continued to lose money in its operation and was unable to pay the $205,000 notes when demand was made by taxpayer and Northwest Industrial Laundry Company and was likewise unable to pay the $150,000 which it owed the Canadian Bank of Commerce, which was guaranteed by taxpayer and Northwest Industrial Laundry Company. Eventually in March, 1955, a compromise was worked out whereby taxpayer received $43,747.20 of the $132,336.11 which he advanced to Northern, and the difference between the two sums, $88,-588.90 is the amount involved in the government's appeal. As a part of the same compromise, taxpayer and others, including the Hooker group sold their stock and debentures in Northern to certain Canadian residents at a substantial loss. Taxpayer, Smith and Hoffman reimbursed the Hooker group for the loss which the Hooker group sustained on the stock and debentures under their oral agreement above referred to. Taxpayer's share of this reimbursement amounted to $13,694.99, and it is this amount which is involved in the cross appeal.

## THE GOVERNMENT'S APPEAL

Section 166 of the Internal Revenue Code of 1954 (Title 26, U.S.C. § 166), under which the district court allowed in

full the $88,588.90 as a deduction, provides in pertinent part as follows:

"§ 166. Bad debts

"(a) General rule.—

"(1) Wholly worthless debts.— There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

"(2) Partially worthless debts.— When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

 \* \* \* \* \* \*

"(d) Nonbusiness debts.—

"(1) General Rule.—In the case of a taxpayer other than a corporation—

"(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

"(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

"(2) Nonbusiness debt defined.— For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than—

"(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer;[2] or

"(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

The government contends that the $83,-588.90 loss incurred by the taxpayer on his loans and advances should have been treated as a nonbusiness bad debt and deducted as a short term capital loss under § 166(d) (1) (B) rather than as a business debt, wholly deductible, as found by the district court. The district court concluded that the debt was one acquired in connection with the trade or business of the taxpayer, and therefore, was not a nonbusiness debt, as that term is defined in § 166(d) (2) (A).[3]

2. Subsection (d) (2) (A) was amended to read "with a trade or business of the taxpayer" instead of "a taxpayer's trade or business", as it had previously read, in 1958 by Public Law 85–866, and by Sec. 1(c) of Pub.L. 85–866 the amendment of this subsection was made applicable to taxable years beginning after Dec. 31, 1953, and ending after Aug. 16, 1954.

3. The district court's conclusion reads in part as follows:

"I submit to counsel that no reasonable person after reading the pre-trial agreed facts and hearing the testimony, which is undisputed in this case, could in any line of reason conclude that the corporate entity in Portland went into this enterprise solely for the purpose of being a stockholder in Northern in Toronto.

"By the same token, I submit that no reasonable person having the same factual situation before it could conclude that Mr. Keeler in the successful laundry business that he was here, in Seattle, considering his age, considering the state of his health, entered into this joint enterprise solely to become a stockholder in Northern with a view of acquiring profits from its—that ownership.

"On the other hand, I submit to counsel that any reasonable person viewing this factual situation could come to only one logical conclusion, that Northwestern in Portland in its corporate entity and in the course of its business joined an enterprise which if successfully developed, would become and benefit its regular course of business; that it entered into this joint venture for the purpose of developing an enterprise that was incidental to and in relation to its business, that of the industrial laundry business in Portland, Oregon.

"By the same token, it must necessarily follow that the majority holder co-partnership of the going business in Seattle entered into that joint venture in Toronto for the same purpose.

"So, I come to the inescapable conclusion that this whole transaction entered into by this tax payer was nothing more than for the benefit of, incidental to, and in relation to his business, that of a co-partner in the going business here in Seattle.

 \* \* \*

"So, I think the distinction that is made with the taxpayer in this case is that he

Whether a particular loss or expense is incurred in a taxpayer's trade or business is a question of fact in each particular case. Higgins v. C. I. R., 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783; Treas.Reg. 1954 Code, Sec. 1.1665. However, when that determination involves the interpretation of a statute the decision of the tax court or district court is subject to review here. C. I. R. v. Smith, 203 F.2d 310, 311 (C.A.2, 1953). In this conection, a statement made in Washburn v. C. I. R., 51 F.2d 949, 591 (C.A.8, 1931) is relevant and bears repeating here:

"The Board here found certain primary facts. It drew therefrom the ultimate conclusion that petitioner was not regularly engaged in trade or business under section 204 (a). This required a construction of section 204(a) as applied to the facts. The question here is a mixed one of law and fact. Where similar question was raised in Bishoff v. Commissioner of Internal Revenue (C.C.A. [3]) 27 F.(2d) 91, 92, the court said: 'Even accepting as conclusive the Board's findings of primary facts, it sometimes happens that the reviewing court must inquire, as on writ of error, into the ultimate fact finding in order correctly to determine whether the decision is validly supported by evidence and therefore is "in accordance with law".' * * * that there may be some degree of finality in a finding of fact by an administrative body may be conceded, but such finding cannot take from the courts the power to construe a statute and determine whether it covers such a situation as the facts present. * * *"

So here the question for determination is whether the factual situation found by the district court is covered by the statute.

In support of its contention that the district court erred in its holding that the loans by taxpayer to Northern were made in connection with his Seattle business, and, therefore, were deductible as business bad debts rather than as non-business bad debts, the government relies principally on the cases of Holtz v. C. I. R., 256 F.2d 865 (C.A.9, 1958) and O'Neill v. C. I. R., 271 F.2d 44, 48 (C.A. 9, 1959); In the O'Neill case, the court stated:

"It is well settled that the only instances in which the taxpayer who owns a corporation, recognized as a tax entity, can take a business loss deduction for his financing of the corporation, either by way of loans or contributions to capital, are (1) where he is in the business of loaning money, or (2) he is in the business of promoting, financing and managing business enterprises. Holtz v. Commissioner, 9 Cir., 1958, 256 F.2d 865, 870; Skarda v. Commissioner, 10 Cir., 1957, 250 F.2d 429, 435; Wheeler v. Commissioner, 2 Cir., 1957, 241 F.2d 883, 884; Berwind v. Commissioner, 20 T.C. 808, 815."

It was stipulated herein that taxpayer was not in the business of loaning money or of promoting, financing and managing business enterprises. This stipulation, in the light of the rule announced in the O'Neill case, above quoted, and the cases therein cited would seem to settle the matter conclusively that the taxpayer's bad debt loss involved herein was not a business bad debt and deductible as such.

However, taxpayer cites numerous cases [4] wherein loans by a taxpayer were

did not enter into the Toronto venture for the purpose of receiving profits from it, his prime purpose was to aid and to nurture and to build up his going business here in Seattle.

"So, I reason that he entered into this transaction solely as his relation to and a part of his going business here in Seattle."

4. Tony Martin v. C. I. R., 25 T.C. 94 (1955); Dorminey v. C. I. R., 26 T.C. 940 (1956); MacLevine, 31 T.C. 1121 (1959); Lawrence N. Weil, 29 T.C. 366 (1957); Mays v. C. I. R., 272 F.2d 788 (6 Cir., 1959); Maloney v. Spencer, 172 F.2d 638 (9 Cir., 1949); Bart v. C. I. R., 21 T.C. 880 (1954); Cluett v.

allowed to be charged off as business bad debts when they proved uncollectible, even when the taxpayer was not in the business of loaning money or promoting business enterprises, where it was found that such loans were essential to, or so proximately related to the business of the taxpayer that they could be said to have been made in connection with that business. The government concedes that the O'Neill rule, while determinative in the circumstances presented in that case, is not the sole criterion, and that if the loans bear a sufficiently direct relationship to taxpayer's business, they may qualify as business debts, even though the taxpayer's business is not that of loaning money or promoting business enterprises. But the government contends that a sufficiently direct, proximate relationship between this taxpayer's loans to Northern and his Seattle business is not shown by the evidence here to qualify such loans as business debts of the Seattle enterprise. With this last contention we must agree.

The district court found that taxpayer entered into the transactions with Northern for the benefit of, and to aid and nurture and build up his going business in Seattle (See Footnote 3), but did not spell out in the findings in what manner the creation of Northern and the loans thereto were intended to benefit taxpayer's industrial laundry business in Seattle. However, these claimed benefits are found in the testimony of taxpayer and Smith, the owner of the industrial laundry business in Portland.

 This testimony shows that taxpayer, Smith and Hoffman considered Canada to be a ripe market for the industrial laundry business, and they formed Northern and commenced operations in Toronto as the first in a contemplated chain of industrial laundries that would be opened up in other Canadian cities, after the Toronto plant became established. It was estimated that from one to three years would be required for the Toronto plant to become sufficiently successful to warrant starting the next laundry in the chain. "Very material benefits" to his Seattle laundry business were anticipated by taxpayer as the result of the formation of the Canadian chain of laundries. These material benefits, as testified to by taxpayer, and listed in his brief, are (1) additional buying power resulting in lower prices to Seattle plant; (2) the establishment of sufficient garment volume by joining the purchasing of garments by Hoffman's taxpayer's and Smith's plants with the purchase of garments by the Canadian chain to justify establishing a garment manufacturing plant; (3) exchange of technical information; (4) protection to the Seattle plant because if it were known as one connected with a chain there would be less likelihood of someone else starting a plant in competition with it in Seattle; (5) advertising advantages, and (6) reference to large accounts, that is, if one of the laundry chain in a city other than Seattle landed the account of a large concern which had a branch in Seattle, taxpayer's Seattle laundry, through its connection with the chain, could be expected to obtain the business of the large concern's Seattle branch.

In view of the taxpayer's entire testimony, some of these anticipated benefits to his Seattle business seem to be more fanciful than real.[5] However, accepting

---

C. I. R., 8 T.C. 1178 (1947); Cowden v. Commissioner, 34 T.C. 819 (1960); and Harding v. United States, 113 F.Supp. 461, 125 Ct.Cl. 585 (1953).

5. Taxpayer testified emphatically that he would not permit his Seattle laundry to become a part of a chain, either American or Canadian, so it is difficult to see how benefits to the Seattle laundry as a member of a chain could materialize. As to the saving anticipated as a result of

lower prices due to combined purchasing power of the contemplated Canadian chain and the three American plants of Hoffman, Smith and taxpayer, this benefit, too, was perhaps illusory in view of the widely scattered locations of the laundries, with the resultant transportation costs and the tariffs involved in getting the bulk purchases into either the U.S. or Canada, depending on where they were made. There is no evidence that

**430**

the claimed benefits to taxpayer's Seattle business at their face value, under the authorities they still would not establish a sufficiently close relationship between the taxpayer's loss on his loans to Northern and his Seattle business to warrant the deduction of those losses as business bad debts.

Wheeler v. C. I. R., 241 F.2d 883 (C.A. 2, 1957) and Gulledge v. C. I. R., 249 F.2d 225 (C.A.4, 1957) are two cases where the taxpayers were refused business bad debt deductions on factual situations much more strongly in their favor than those in this case. In Wheeler, the taxpayers had been in the shipbuilding business as a family since 1919. During the war they formed a corporation to carry on that very shipbuilding business, and from time to time made advances and loans to that corporation. When the corporation was unable to repay the loans taxpayers attempted to deduct the losses as business bad debts, but were refused such deduction. In Gulledge the taxpayer was a peanut farmer. In order to obtain better prices for the product of his peanut farming business, with three others he organized a corporation to operate a peanut processing plant. As a result of the operation of the peanut processing plant the taxpayer did in fact directly benefit his peanut farming business by receiving a higher price for his peanuts. Loans were made by the taxpayer and others to the peanut plant corporation which the corporation was unable to repay. Taxpayer was refused a business bad debt deduction in these circumstances, the court saying at 227:

"It is true that the taxpayer and the other stockholders were induced to contribute to the capital of the corporation in the hope that the establishment of a peanut mill in their neighborhood would enable them to secure a better price for their pea-

nuts, and hence it may be said in a broad sense that the business of the farmers and the business of the corporation were related. It does not follow, however, that the business of the corporation was incidental to the business of the taxpayer and that the loss of the money loaned by him to the corporation was incurred in the operation of his farms. The two businesses were separate and distinct. The taxpayer owned the one directly while in the other he had merely the interest of a stockholder. The corporation was not merely a department of the business of his farm. Not only was the corporation a separate business and taxable entity, but it was set up to purchase and process not only the taxpayer's crop but also the peanuts of all the other growers in the locality; and it was formed in the expectation that it would return a profit to its founders. * * *"

The taxpayer here testified that in addition to the alleged benefits to his Seattle plant, he expected to realize profits from the Toronto plant and the other contemplated Canadian laundries.

In Allen v. C. I. R., 283 F.2d 785, at page 791 (C.A.7, 1960) many of the same contentions made by the taxpayer here were advanced and what the court had to say in rejecting them is particularly applicable here:

"The Tucson corporation was organized and operated as a separate legal entity. It had its own stockholders, and those holding a majority interest had no connection at all with taxpayer's Milwaukee business. The businesses were separate and distinct, and operated in distant franchised territories. Neither bought or sold to the other.[6] They had no common customers.

Hoffman, Smith and taxpayer, while working together on the Canadian venture, ever pooled the purchases of their American plants in order to obtain lower prices.

6. Taxpayer here did sell some used equipment to the Toronto laundry, but such transaction was merely incidental to the Toronto plant getting started, and was not such a transaction as would likely be repeated.

\* \* \* \* \* \*

"We have examined the taxpayer's testimony and considered the arguments he advances thereon to the effect that the Tucson venture served his intended future promotion activities in providing an opportunity to demonstrate the advantages of the Mobilamerica process in connection with defense housing projects; the chance it afforded to build the model plant Mobilamerica had designed and recommended; the use of the Tucson venture and plant as a testing laboratory for new methods and materials to the benefit of his Milwaukee operation; and his desire to maintain a close relationship with Hugh Curran, the key man of the Mobilamerica system. These and the other factors which may have motivated the taxpayer are in our opinion remote and do not establish the proximate relationship of the payments to the taxpayer's business essential to meet the requirements for full deductibility as business expenses or losses. \* \* \*"

Other cases where taxpayers were refused deductions as business bad debts on facts considerably stronger in their favor than those existing in the taxpayer's favor here are Interstate Transit Lines v. Commissioner, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943); Pokress v. Commissioner, 234 F.2d 146 (C.A. 5, 1956); A. Giurlani & Bro., Inc. v. Commissioner, 119 F.2d 852 (C.A.9, 1941).

The cases relied on by taxpayer, cited in footnote 4, are cases where the loans in question provided an immediate and direct benefit to taxpayer's business. In each case the corporations to whom the loans resulting in losses were made were formed for the purposes of carrying on the taxpayer's already existing business or benefiting an existing business by providing it supplies or furnishing outlets and the relationship was much more direct than that existing between taxpayer and the Toronto laundry. Thus in Tony Martin, the corporation was formed to carry on his business as an actor and entertainer; in Dorminey, the corporation was formed to insure a supply of bananas for Dorminey's business; in MacLevine the corporation was formed to provide fabrics which were necessary to complement the taxpayer's business of manufacturing bed springs and furniture; in Lawrence N. Weil the corporation was formed to furnish a west coast outlet for some of taxpayer's Buffalo business products and to retain the services of a valuable employee of the Buffalo business; in Mays the corporation was formed for the purpose of obtaining and enlarging retail outlets for the taxpayer's existing business of distributing cigars; in Bart the loan was made to a publication company which was a client of taxpayer, an advertising agent, in an effort to retain the publication as a client and to retain other client's advertising in the publication of the publishing company. In each case the loan made by taxpayer presently enabled him to realize direct business benefits to himself. In Cluett it was held that taxpayer's business involved owning a seat on the stock exchange and the loss occurred when he sold his one-fourth accretion to his stock exchange seat on credit, taking notes which became worthless. In Cowden it was held that taxpayer's management contract with an insurance company was his business, and the loan to the insurance company guaranteed by taxpayer was used to expand the company's business which naturally increased the management contract business of taxpayer. Harding involved a loan by taxpayer, a member of a partnership brokerage firm, to a third person for the purchase of a seat on the stock exchange for the purpose of handling the brokerage firm's business on the exchange. In Maloney v Spencer, it was found that the losses on loans were incurred in his business of "acquiring, owning, expanding, equipping and leasing food processing plants". All of these cases are distinguishable on their facts from this case.

■ As an alternative theory of recovery in the district court, taxpayer

urged that if the $88,588.90 loss was not deductible in full as a business bad debt under § 166 of the Internal Revenue Code (26 U.S.C. § 166), it was deductible in full under § 165 of the Code as a loss incurred in a transaction entered into for profit though not connected with a trade or business, and now seeks to uphold the district court's decision on this alternative theory. Taxpayer cites Jaffke v. Dunham, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957); Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Egan v. Teets, 251 F.2d 571 (C.A.9, 1957); 222 East Chestnut v. Lakefront, 256 F.2d 513 (C.A.7, 1958); and Banks v. United States, 267 F.2d 535 (C.A.2, 1959) in support of the proposition that the judgment will be sustained if valid on any ground even though not the ground assigned by the district court. With this latter proposition we can agree; with taxpayer's alternative theory of recovery we cannot.

■ In Spring City Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L. Ed. 1200 (1934) and Putnam v. Commissioner, 352 U.S. 82, 77 S.Ct. 175, 1 L. Ed.2d 144 (1956), the Supreme Court made it abundantly clear that nonbusiness bad debt losses deductible under § 166 only as short term capital losses may not be deductible in full as losses incurred in a transaction entered into for profit under § 165. There is no question that the $88,588.90 loss arose as a result of a bad debt, and not otherwise. In the pre-trial order in the district court it was provided, "There is no dispute between the parties to this action that such advances represent loans and credit from plaintiff (taxpayer) to Northern, and for which Northern was indebted to plaintiff". And that such bad debt loss is a nonbusiness bad debt loss is demonstrated by the discussion above.

On the government's appeal the judgment below is reversed and the case remanded to the district court with directions to enter judgment in favor of the government with respect to the $88,-588.90 item.

## TAXPAYER'S CROSS APPEAL

Taxpayer contends the district court erred in not allowing him a deduction in full, under 26 U.S.C. § 165, of the $13,-694.99 which he paid as his share of the guaranty made to the Hooker group that they would not sustain any loss on their investment in Northern.[7] The pertinent part of § 165 provides:

"§ 165. Losses

"(a) General Rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \*

"(c) Limitations on losses of individuals.—In the case of an individual, the deduction under subsection (a) shall be limited to—

"(1) losses incurred in a trade or business;

"(2) losses incurred in a transaction entered into for profit, though not connected with a trade or business; \* \* \*."

For the reasons outlined above in connection with the government's appeal, there was not a sufficiently direct connection between Northern and taxpayer's Seattle business to warrant the deduction of this $13,694.99 loss as one incurred in connection with his trade or business. Therefore, if that loss is deductible in full, as taxpayer contends, it must be as a loss incurred in a transaction entered into for profit, though not connected with a trade or business.

---

**7.** In his tax return taxpayer treated this payment as a short term capital loss, and it was allowed as such by the District Director. In the district court taxpayer contended that this payment represented either a loss incurred in a trade or business or a loss incurred in a transaction entered into for profit though not connected with a trade or business. The district court found that it should be "treated as a loss upon the purchase of stock".

■ Under the statute and the cases, the taxpayer must have had the intention or purpose of gaining a profit in order that the loss sustained be deductible under § 165(c) (2) (Anno. 39 A.L.R. 2d 889); and the burden of establishing that the transaction was entered into for profit rested on the taxpayer. Boehm v. Commissioner, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945); Fox v. Commissioner, 190 F.2d 101 (C.A.2, 1951); Seaman v. United States, 156 F.2d 719, 724, (C.A.7, 1946).

■ Considering only the guaranty to the Hooker group as the "transaction" involved in this question, it is clear that the guaranty was not "a transaction entered into for profit" within the meaning of the statute. Under the guarantee, the best taxpayer could hope for was that he would not sustain a loss. If the Hooker group's investment in Northern proved successful, the Hooker group, not taxpayer, would reap the profit. If the investment proved unsuccessful, as turned out to be the case, taxpayer sustained the loss. Such a transaction which can result in a loss to taxpayer, but from which he cannot possibly reap a profit, is not a transaction entered into for profit. Goldsborough v. Burnet, 46 F.2d 432 (C.A.4, 1931); Burdan v. Commissioner of Internal Revenue, 106 F.2d 207, 210 (C.A.3, 1939); Slover v. United States, 33 F.Supp. 446, 91 Ct.Cl. 287 (1940); Clark v. Kavanagh, 59 F.Supp. 806 (E.D.Mich., 1944), affd. 152 F.2d 49.

However, taxpayer contends that the "transaction" to be considered involves his entering into the creation of Northern, from which he hoped to derive a profit, and that the guaranty of the Hooker group's investment in Northern was an integral part of the entire transaction. Assuming this to be true, the profit which taxpayer could hope to realize would lie in the increased value of his investment in Northern, and possibly greater dividends from that investment. It is to be borne in mind that the stock and debentures which the Hooker group purchased did not belong to taxpayer, but to the corporation, and taxpayer received no direct benefit from the investment. In this connection, the situation here differs from the situation in Hale v. Commissioner, 32 B.T.A. 356 and Carl Hess, 7 T.C. 333 and similar cases cited by taxpayer. In those cases the guaranty was made in connection with the sale of stock owned by the taxpayer himself, and he stood to benefit directly by such sale.

It has been held that a transaction or expenditure by a stockholder which may benefit a corporation directly and will indirectly benefit the stockholder through the enhancement of the value of his stock and the increase of dividends on the stock is only of indirect benefit to the stockholder and is not a transaction for profit. DuPont v. Commissioner (1938) 37 B.T.A. 1198, affd. C.A.3, 118 F.2d 544, cert. denied, 314 U.S. 623; DuPont v. Deputy (D.C.Del., 1938) 22 F.Supp. 589; Wigton v. Commissioner (1943) 13 T.C. 323; Hogan v. Commissioner (1936) 35 B.T.A. 26; Slover v. United States, supra.

However, such a rigid rule seems to be too narrow and inflexible. In Commissioner v. Duberstein, 363 U.S. 278, at p. 286, 80 S.Ct. 1190, at p. 1197, 4 L.Ed. 2d 1218, in speaking of the criteria to be applied in determining whether money or goods received by a taxpayer constituted a gift or income, the Supreme Court said:

"We take it that the proper criterion, established by decision here, is one that inquires what the basic reason for his (the donor's) conduct was in fact—the dominant reason that explains his action in making the transfer. Further than that we do not think it profitable to go."

While this statement was made by the Supreme Court in connection with a different section of the Internal Revenue law than we are concerned with here, we think the reasons given by the Supreme Court for refusing to sanction a hard and fast rule in the Duberstein case, are equally applicable here in determining whether a transaction is one entered in-

to for profit under Sec. 165(c) (2). The provision for allowance of losses incurred in a transaction entered into for profit first appeared in the Revenue Act of 1916 and has been construed ever since in terms of the taxpayer's state of mind, and the determination made with reference not to hard and fast rules, but to the facts developed in each particular case. 5 Mertens Law of Federal Income Taxation, Sec. 28.34; Anno. 39 A.L.R.2d 883. In other words, the determination is to be made by the fact finder after a consideration of all of the pertinent and relevant evidence.

■ The evidence in this case as to the taxpayer's motive in making the guaranty to the Hooker group is very slight. Assuming that there was sufficient evidence from which the jury could have found that the guaranty on the taxpayer's part was a transaction entered into for profit, the court erred in not submitting the question to the jury and in himself deciding that the taxpayer was entitled to deduct the item as a capital loss. However, it was an error in taxpayer's favor from which he suffered no prejudice and of which he cannot complain, and the government has not appealed on this point. If the question had been submitted and the jury found that the transaction was not one entered into for profit, taxpayer would have been entitled to no deduction at all. On the other hand, had the jury found in taxpayer's favor that the transaction was one entered into for profit, he still would have been entitled to the same capital loss deduction which the court allowed for the reasons which follow.

Section 165(a) of Title 26, U.S.C. states the general rule that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance. Sec. 165 (c) (1) and (2), insofar as individuals are concerned, limits the deductions granted by 165(a) to losses incurred in a trade or business, or to those suffered in a transaction entered into for profit. Sec. 165(f) is a further limitation on the deductions allowed by 165(a), and provides that losses from sales or exchanges of capital assets shall be allowed only as capital losses and deductible only as provided in Sections 1211 and 1212.

Now, it is absolutely clear that had the Hooker group sold their stock at a loss and remained unreimbursed, they would have been entitled only to a capital loss deduction for such loss because of Sec. 165(f). Certainly, when the loss passed to taxpayer by virtue of the guaranty agreement, he should be entitled to no more favorable consideration than the original losers. If the guaranty was made to the Hooker group by the taxpayer as a transaction entered into for profit (and it must be regarded as such if taxpayer is to receive any deduction at all for the resultant loss), then it must be regarded as an investment, and the resulting loss must be treated as a loss on investment. Had taxpayer chosen to make his investment by direct purchase of stock, the resultant loss would be a capital loss under 165(f); had he made his investment in the form of a direct loan to the corporation, or by guaranteeing bank loans to the corporation, the loss would have been a nonbusiness bad debt deductible as a capital loss under Sec. 166(d). To hold that he is entitled to more favorable treatment because he chose to make his investment in the manner he did, would be entirely unrealistic, and would create a tax loophole that was never intended by Congress. The case of Putnam v. Commissioner, supra, supports this reasoning.

Reversed on the appeal, affirmed on the cross appeal, each party to bear their own costs.