## DU PONT v. COMMISSIONER OF INTERNAL REVENUE.

## RASKOB v. COMMISSIONER OF INTERNAL REVENUE.

Nos. 7044, 7053.

Circuit Court of Appeals, Third Circuit.

March 6, 1941.

Rehearing Denied March 31, 1941.

A. Chauncey Newlin, of New York City, James S. Y. Ivins, of Washington, D. C., and Joseph M. Hartfield, of New York City (White & Case, Walter S. Orr and Winslow M. Lovejoy, both of New York City of counsel; Ivins, Phillips, Graves & Barker, of Washington, D. C., on the brief), for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Arnold Raum, Norman D. Keller, and Carlton Fox, Sp. Assts. to Atty. Gen. (J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and Mason B. Leming, Asst. Chief Counsel, Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before BIGGS, CLARK, and BUFFINGTON, Circuit Judges.

CLARK, Circuit Judge.

The two petitioners wished to reduce their income taxes. This desire is shared

by many of their fellow citizens, rich or poor, and therefore is so far, so good. The Government contends, however, that too far is· not so good and says that here the taxpayers employed a device that did go too far, in the legal sense at any rate. They went down a road which has not been marked by any very satisfactory judicial "dangerous curve ahead" signs. The relation (or lack of it) between ethics and tax avoidance (evasion) has puzzled judges and others who have considered the subject.[1]

The road taken by the taxpayers was opened for travel by the legislative adoption of the realization, as contrasted with the accrual, method of determining capital gains and losses.[2] The attachment of an artificial importance to the fact of sale placed a powerful weapon in the hands of ·the taxpayer. In its selection of this arbitrary criterion, the Congress used the bare phrase "sale or exchange".[3] Standing alone, it imported too much unreality. The courts filled in the outline with the obviously indicated bona·fides.[4] That qualification of the legal act sometimes faced them and now faces us with the embarrassment attendant upon delving into and appraising the human mind. For good faith, or the lack of it, is not always made outwardly manifest.

The difficulty of that appraisal led to some narrowing of the field of its exercise. When the courts find the unraveling too hard, the Congress cuts the knot. We all yield to that human instinct whose futility is expressed in an ancient and homely phrase.[5] Taxpayers are no exception. They insist upon claiming losses while retaining or regaining benefits inconsistent with a normal sale. To divest a sale of its fundamental incident of finality plainly requires a controlled or sympathetic vendee. Such dominion might be and was accomplished either boldly through contracts or options to repurchase and the creation of fictitious entities or it might be and was accomplished through the more subtle ties of affectionate interest found among families and friends, business or otherwise.

In placing one or another type of transaction within or without Mr. Justice Holmes' line the Congress had, of course, to follow some sort of principle of probable error. Fairness demanded a division based on a "likelihood of bad faith". Acting on this thesis the Congress has relieved and superseded the courts in the following instances, year-end wash sales,[6] the so-called boudoir sales,[7] and sales aiming to take advantage of the corporate fiction.[8] The Scylla of precise legislative definition and the Charybdis of an ad lib judicial process have been observed.[9] In the one alternative bona fides becomes too rigid, causing innocent and ordinary business re-

---

[1] United States v. Isham, 17 Wall. 496, 21 L.Ed. 728; Bullen v. Wisconsin, 240 U.S. 625, 630, 36 S.Ct. 473, 60 L.Ed. 830; Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355; Paul, Studies in Federal Taxation, Restatement of Tax Avoidance, Moral Considerations Affect Treatment of Tax Avoidance, pp. 80–87; Buck, Income Tax Evasion and Avoidance: Some General Considerations, 25 Georgetown Law Journal 863; Angell, Tax Evasion and Tax Avoidance, 38 Columbia Law Review 80.

[2] Both the general scheme and the particular theory have been freely criticized. Seligman, Income Tax, 7 Encyclopædia of the Social Sciences 626; Wueller, Concepts of Taxable Income III, 54 Political Science Quarterly 555; Kent, Taxation of Capital Gains and Losses, 16 Tax Mag. 389; Simons, Personal Income Taxation 148–168; Magill, Taxable Income 166 et seq.; cf. Haig, Taxation of Capital Gains, Wall St. Journal, March 23–April 13, 1937; Report of Subcommittee on Ways and Means on Proposed Revision of the Revenue Laws, 75th Cong., 3d Sess. 28–32.

[3] Revenue Act of 1928, § 101(c) (1), 26 U.S.C.A. § 101(c) (1), 26 U.S.C.A. Int. Rev.Acts, page 371.

[4] American Auto Trimming Co. v. Lucas, 59 App.D.C. 171, 37 F.2d 801; Wishon-Watson Co. v. Commissioner, 9 Cir., 66 F.2d 52; Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214; Commissioner v. Dyer, 2 Cir., 74 F.2d 685; Commissioner v. Troup, 7 Cir., 75 F.2d 1010; Commissioner v. Eldridge, 9 Cir., 79 F.2d 629, 102 A.L.R. 500.

[5] "Would yee both eat your cake and have your cake?", John Heywoodes Woorkes, first printed in 1546; cf. George Herbert, The Size.

[6] 26 U.S.C.A. Int.Rev.Code, § 113(a) (10).

[7] 26 U.S.C.A. § 24(a) (6) (1934).

[8] 26 U.S.C.A. § 24(a) (6), Internal Revenue Code § 24(b) (1939), 26 U.S.C.A. Int. Rev.Code, § 24(b).

[9] Eichholz, Should The Federal Income Tax Be Simplified?, 48 Yale Law Journal 1200.

lations to suffer,[10] while the wicked go about their wickedness.[11] In the other, the chaos of the cases is sufficient proof of trouble.

However all that may be, the Congress has not seen fit to sever our particular skein. It has attempted no delimitation of good faith here. It has not, as it might have, extended proscribed repurchases to include those not on the open market,[12] or those from persons in the theoretically less intimate relations. So, determination must be made by reading the mind of the tax-payer vendor—a task for which the medieval judge expressed distaste saying, " * * * for it is trite learning that the thought of man is not triable, for the devil himself knows not the thought of man * * *." [13] The thought of homo-taxpayer for which a divining rod is needed here concerns only contemporaneous concert for the repurchase of the securities. If there is such "coexistent intention", the taxpayer has both his loss and his stocks and so has not shown the "good faith" his Government's revenue requires.

By definition almost, no help need be expected from the taxpayer. He is not usually going through expensive motions for the purpose of ultimately conceding himself out of court. Most judges have given little credence to any wide eyed disavowals from his direction.[14] But some courts are more trusting.[15] Here, as we shall see when we come to a recital of the facts, there is actual, although perhaps unconscious and involuntary, evidence of intention.

The selection of a particular sympathetic vendee is the keystone of the arch of feasibility of repurchase. Such choice in a wide field calls for an explanation. It has underlying it the logic of the rebuttable presumption. Explanations may be as varied as the possible combinations of facts and no one type is exclusive. One may

observe at least one general thread—general because it goes to the core of the necessity to account. Sympathy along with many human emotions is evanescent. Whatever goes to its dispersal is relevant. The cases find lapse of time,[16] lack of contact,[17] and change of condition,[18] significant. Sympathy is apt to cool from any one of the three causes. With these governing considerations in mind, let us proceed to a more detailed analysis of the facts.

The mutual vendees are "sympathetic". This is rather less than denied. One followed the other up the ladder of financial success, starting in Ohio forty years ago. They occupied principal executive positions in du Pont and General Motors and held together the directorates generally appertaining to such industrial activity. The business association, as often, included social intimacy;[19] they shared offices in Wilmington and New York, and lived in the same apartment building in the latter place.

■ There are two transactions about which the Government complains. The first began on November 13, 1929, and ended on January 6, 1930, and involved the sums of $4,582,750 and $4,606,000 on direct and $5,254,125 and $5,989,500 on reversal. All the securities were listed on an exchange and the prices were within the market of the day. They could not, of course, be actual on the original sale and they seem to have been fancifully selected being neither high, low, open nor close. The two checks together with accompanying deposit slips were delivered in the same envelope to the receiving teller of the Bankers Trust Company in which the vendors-vendees had checking accounts and of which they were directors. On reversal the same stock certificates (with two exceptions) were returned. The prices this time (with one exception) were at low of

---

[10] Montgomery, Federal Income Tax Handbook, 1935, p. 513.

[11] Madeira v. Commissioner of Internal Revenue, 3 Cir., 98 F.2d 556.

[12] Samuel M. Vauclain v. Com'r, 16 B. T.A. 1005.

[13] Brian, J., Year Book, 17 Edward IV, 1, 2 (1477).

[14] Commissioner v. Dyer, 2 Cir., 74 F. 2d 685, certiorari denied, 296 U.S. 586, 56 S.Ct. 97, 80 L.Ed. 414; Rand v. Helvering, 8 Cir., 77 F.2d 450; Powell v. Commissioner, 1 Cir., 94 F.2d 483.

[15] Commissioner v. W. F. Trimble & Sons Co., 3 Cir., 98 F.2d 853.

[16] John E. Lonergan v. Com'r, 4 B.T. A. 1209; Gray-Barkley Co. v. Com'r, 11 B.T.A. 499; General Securities Co. v. Com'r, 38 B.T.A. 330.

[17] Commissioner v. Neaves, 9 Cir., 81 F. 2d 947; Charles E. Mitchell v. Com'r, 32 B.T.A. 1093.

[18] Cole v. Helburn, D.C., 4 F.Supp. 230; Commissioner v. Hales, 7 Cir., 76 F. 2d 916.

[19] " * * * and there is a friend that sticketh closer than a brother", Old Testament, Proverbs, Chapter 18, line 24.

the market for the day. This time the checks were mailed together from Wilmington to the Bankers Trust. Because of the price discrepancy, one gave the other an unsecured note for $700,000. The accounting between the parties was brought into balance by a short sale, which petitioners claim was a separate transaction, at the market prices of convenient dates.

The second reciprocal sale commenced on December 26, 1929, and ended January 27, 1930, and was for the sums of $1,560,000 and $1,569,000 respectively. One of the stocks was sold at ½ point off the low of the day. Again the checks were mailed in the same envelope and again the stock certificates (within this instance two exceptions) were the same. In this transaction, however, there occurred the previously mentioned involuntary evidence of the taxpayer's intention—an aid whose usual absence we have noted and regretted. One of the parties expected to spend part of the holiday in Florida. Before he left and on January 10, 1930 he signed two checks with dates and amounts blanks and two letters which were postdated. Obviously a coincident intention to repurchase follows inescapably from advance preparation to do so. The "disavowal" here was only to the best of the vendee's recollection and the plain testimony of the Government's document experts was allowed to stand.

Even the most cursory survey of these proceedings reveals no trace of the sympathy weakening factors of which we have spoken. The time elapsed was just about the shortest legally possible (53 and 32 days respectively); the contact between the participants was their routine one of close business and social intimacy—the record is replete with their conversations inter se, both face to face and over the telephone—and no change of status whatever occurred. Rather the petitioners attempt to give verisimilitude to their transactions by reliance upon their own protestations and upon their construction of three circumstances, all of which may be said to be open to two interpretations, one favorable and the other dubious.

We do not consider it necessary to adopt one or the other. The circumstances are, first, a sale of some of the purchased securities by one vendor-vendee to his wife's wholly owned corporation; second, the risk of loss inherent in the stock market fluctuations; and third, the financial spread between the parties without the balancing of the short-sale. On the one hand, lip-service was paid to the corporate fiction of the wife's holding company by a tax acknowledgment of profits; on the other hand, no difficulty in borrowing back the stock was experienced. The market fluctuations could be damaging only to the extent that the blocks of stocks moved disproportionately and in any case the large amount, $7,000,000, of the claimed deductions might effect an eventual saving. The short-sale was covered by a note which has disappeared and by no delivery of collateral, and it was closed at an arbitrary price which did, in fact, bring the $29,000,-000 dealings into balance within $46.86. This may have been a coincidence or the real purpose may have been the protection of friends and employees who had been speculating in the stock sold short.

These explanations which themselves require explanations are not, in our opinion, sufficient to escape the impact of Mr. Justice Cardozo's words: "The mind rebels against the notion that Congress * * * was willing to foster an opportunity for juggling so facile and so obvious. * * * To such an attempt the reaction of an impartial mind is little short of instinctive that the deduction is unreasonable * * *." Woolford Realty Co. v. Rose, 286 U.S. 319, 330, 52 S.Ct. 568, 570, 76 L. Ed. 1128.[20]

As our reasoning is the same as that of the Board of Tax Appeals, we are not constrained to any avoidance of responsibility by resort to the rule of substantial evidence.[21] Pending legislation indicates some

---

[20] Cf. Marston v. Commissioner, 2 Cir., 75 F.2d 936; Shoenberg v. Commissioner, 8 Cir., 77 F.2d 446, 449.

[21] Albertsworth, Judicial Review of Administrative Action By The Federal Supreme Court, 35 Harvard Law Review 127; Hankin, Conclusiveness of the Federal Trade Commission's Findings as to Facts, 23 Michigan Law Review 233; Administrative Tribunals—Conclusiveness of Finding of Fact, 27 Michigan Review 943 (note); Landis, Administrative Policies and the Courts, 47 Yale Law Journal 519; Administrative Law—Conclusiveness of Findings of Fact by Federal Commissions, 5 University of Chicago Law Review 495 (note); Brown, Judicial Review in Taxation, 27 Georgetown Law Journal 37; Warren, An Approach to the Extent of Judicial Supervision Over Administrative Agencies, 28 Georgetown Law Journal 1042; Sufficiency of Evi-

dissatisfaction with its ratio decidendi.[22] The matter is further complicated by some unsatisfactory distinctions between primary and secondary facts or fact[23] and the inferences therefrom.

One petitioner makes some point of a deduction arising out of a sale of stock to "nine young" executives of his company. He does not urge it strongly and, as we think, should not. He is clearly foreclosed by the decision of the Supreme Court reversing us.[24] The only factual difference is chronological, a different tax year, and the only legal difference is an attempt to argue again a theory put forward in the District Court[25] and abandoned from that time on.

The other petitioner also argues the fact that when he "sold" some of the stocks in question to his wife's holding company and another, he reported a taxable profit of $201,256.40. He asserts that if the transfers and retransfers between the petitioners were not bona fide sales, he should not be taxed for profits made by his dealing with the stock as his own during the interim of transfer and retransfer. The Board of Tax Appeals refused to pass on this issue on the ground that the claim was not properly raised by the pleadings and was not discussed in the brief. Even if the claim was properly presented (it might have been raised earlier in the pleadings than it was), it would not have been allowed. The claim is based upon the supposition that when the petitioner dealt with stock acquired by means of a non-bona fide sales, he was dealing with borrowed stock.[26] But the stock was not borrowed stock. While the petitioner held the stock—that is, until the time of retransfer —he might deal with the stock as his own. Nor did he have to retransfer the identical certificates to his original vendor. If he returned "substantially identical securities"[27] to his vendor, no loss might be claimed by the vendor. Whatever title the vendee may have had, if he dealt with the stocks as his own and thereby profited, that profit was taxable.

The decisions of the Board of Tax Appeals are affirmed.

dence to Sustain Findings, 29 Georgetown Law Journal 179 (note); Judicial Test of Sufficiency of Evidence as Applied to Administrative Process, 8 George Washington Law Review 108 (note).

[22] Final Report of the Attorney General's Committee on Administrative Procedure, United States Government Printing Office, 1941.

[23] Weir v. Commissioner, 3 Cir., 109 F. 2d 996, 997, 998; cf. Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917; Helvering v. Kehoe, 309 U.S. 277, 60 S.Ct. 549, 84 L.Ed. 751; Slayton v. Commissioner, 76 F.2d 497, certiorari denied, 296 U.S. 586, 56 S.Ct. 131, 80 L. Ed. 415; Canister Co. v. Commissioner, 3 Cir., 78 F.2d 1013.

[24] Deputy v. DuPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416.

[25] DuPont v. Deputy, 22 F.Supp. 589.

[26] If borrowed, his dealings for which he paid a tax on a reported profit would be in the nature of a short sale and therefore not taxable until covered. See Robert W. Bingham v. Com'r, 27 B.T.A. 186.

[27] 26 U.S.C.A. Int.Rev.Code, § 118(a).