ESTATE OF EVELYN McGLOTHLIN, DECEASED, RAY McGLOTHLIN, JR., EXECUTOR, AND RAY McGLOTHLIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5567–63. Filed July 22, 1965.

*Ronald M. Mankoff, Wentworth T. Durant,* and *Robert E. Davis,* for the petitioners.

*R. A. Roberts,* for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the taxable year ended May 31, 1959, in the amount of $218,990.05. Petitioners' initial objection that respondent's action is barred by the statute of limitations was conceded by them in the reply brief. The parties agree that the only issue remaining for decision is whether a payment by petitioner Ray McGlothlin of the sum of $261,968.74 to Texas Calgary Co. during the taxable year in question gave rise to a deductible loss under section 165(c)(2), I.R.C. 1954.

FINDINGS OF FACT

A stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference.

Ray McGlothlin (sometimes hereinafter referred to as petitioner) and Evelyn McGlothlin were husband and wife and, during the period here invoved, resided at Abilene, Tex. On November 13, 1959, they filed a joint Federal income tax return, on the cash method of accounting, with the district director of internal revenue at Dallas, Tex.

Evelyn McGlothlin passed away on September 19, 1964, and Ray McGlothlin, Jr., having duly qualified as executor, was substituted as a party.

Petitioner worked in the oil industry from the age of 17, digging ditches, mixing concrete, and cutting pipe; in 1934, he went into the oil business in Goldsboro, Tex.

Petitioner had his first dealings with Walter Seligman (hereinafter referred to as Seligman), who then owned 58 percent of the stock of Petroleum Products Co., in 1939 when the latter company contracted to sell crude oil from the Hospaw Oil Field in New Mexico to petitioner and his partner.

In 1940, petitioner and his partner purchased Seligman's interest in Petroleum Products Co. Petitioner subsequently acquired all of the stock in Petroleum Products Co. by purchase from his partner and

the other stockholders in that company with the exception of Vernon King, who retained the stock he had acquired prior to 1940.

In June 1943, Petroleum Products Refining & Producing Co. was organized in New Mexico and succeeded to the interests of Petroleum Products Co. and two other corporations operating in the area.

Prior to November 4, 1955, the outstanding capital stock of Petroleum Products Refining & Producing Co. (hereinafter referred to as Petroleum Products) was owned as follows:

|  | Shares |
| --- | --- |
| Ray McGlothlin | 6, 747. 7 |
| Massachusetts Mutual Life Ins. Co | 100. 0 |
| Vernon King | 65. 0 |
| Ray McGlothlin, Jr | 73. 0 |
| Ray McGlothlin, Jr., trustee for Hal McGlothlin | 73. 0 |
| Jack McGlothlin | 73. 0 |
| Kay McGlothlin | 26. 0 |
| Joyce McGlothlin | 26. 0 |
| Total | 7, 183. 7 |

In 1949, for the purpose of diversification and to preserve its capital from inflation, Petroleum Products purchased the D'hanis Ranch which consisted of 2,214 acres located in south Texas. Subsequent to 1949, Petroleum Products traded its interest in a feed business for the Blakely Ranch in south Texas and 100 acres in San Antonio, Tex. Thereafter, the 100 acres in San Antonio was traded for the Slator Ranch which contained 17,800 acres near Laredo, Tex. The size of the Blakely Ranch was subsequently increased by the purchase of adjacent acreage and became known as the Crystal City Ranch. Petroleum Products stocked these three properties and operated them as cattle ranches. Resident managers were employed to operate each ranch. During this period, petitioner's permanent home was in Abilene, Tex., except for brief periods when he lived in San Antonio and on the ranches.

In 1952, at the request of Seligman, petitioner became a member of the board of directors of Texas Calgary Co. (hereinafter referred to as Texas Calgary), a publicly held company. Petitioner served in this capacity for a couple of years. In 1953, Seligman approached petitioner with the general idea of merging Texas Calgary and Petroleum Products, but nothing came of the negotiations.

In 1955, Seligman, representing Texas Calgary, called on petitioner in San Antonio and resumed negotiations for the exchange of Petroleum Products stock for Texas Calgary stock. The negotiations for the exchange of stock was based upon a comparison of Texas Calgary's properties and those of Petroleum Products, as well as their comparative incomes and future prospects.

Upon completion of the exchange, petitioner was to be employed as

president of Texas Calgary at a salary of $25,000. As a condition of the exchange, Texas Calgary stock was to be registered on the American Stock Exchange.

The exchange of stock was predicated upon appraisals of the oil reserves, assets, liabilities, and net worth of each company. At that time, Texas Calgary owned oil properties in Canada, Texas, and Oklahoma. Petroleum Products owned an oil refinery at Luders, Tex., and the three ranches as well as oil properties in New Mexico and Montana.

The Texas Calgary directors did not want to acquire the refinery or the ranches owned by Petroleum Products. The refinery was purchased from Petroleum Products at its book value by a corporation formed by petitioner's interests in exchange for its promissory note. Petitioner was not financially able to purchase the ranches nor was he personally interested in going into the ranching business.

Seligman advised petitioner that the Texas Calgary directors did not want the ranch properties and that they questioned the $898,014.08 book value of those properties. Without a satisfactory solution, the deal would have fallen through. Petitioner stated to Seligman that the properties were worth at least $200,000 in excess of book value and agreed that he would guarantee that value. They agreed that if petitioner would guarantee the value of the ranch properties to be $1,098,414.14, then Texas Calgary would complete the exchange of stock.

It was intended that petitioner would sell the ranches as president of Texas Calgary, on behalf of the company. Petitioner hoped the ranches would be sold within 2 years for at least the full amount that he had guaranteed them to be worth. At the time of the exchange, he believed the ranches were worth the guaranteed amount and would be sold within 2 years, so that he would suffer no loss. On or about November 4, 1955, an agreement (hereinafter referred to as the agreement) to exchange all of the stock of Petroleum Products for 6,215,928 shares of Texas Calgary stock was executed.

Paragraph 10 of the agreement provided as follows:

Ray McGlothlin individually and personally guarantees that in the event that the three (3) ranch properties included in the assets of Petroleum Products Refining and Producing Company, with a present fair value of one million ninety-eight thousand four hundred fourteen ($1,098,414.14) dollars and fourteen cents, are not sold by January 15, 1958, for an amount not less than the present fair value, that the said Ray McGlothlin will personally guarantee that upon six (6) months' notice by the Board of Directors of Texas Calgary, Texas Calgary shall receive full payment for such ranches or such ranch properties as remain, said payment to be no less than the present fair value of the ranch properties. If the Board of Directors of Texas Calgary rejects a bona fide offer to purchase the aforesaid ranch properties for an amount not less than the present fair value of said properties, or in the event that the Board of Directors of Texas Calgary rejects a bona fide offer to purchase the aforesaid ranch properties for an amount less than the present fair value of the said properties,

said Ray McGlothlin, having agreed to pay the difference between the present fair value and the offering price, then, and in either event, the said Ray McGlothlin is fully discharged from the obligation arising from the guarantee contained in this Paragraph.

Petitioner's primary motive for executing the guaranty agreement was to acquire Texas Calgary stock. This stock, which would be listed on the American Stock Exchange, was then to be sold by petitioner in order to obtain the cash required to retire an overdue note obligation.

On January 25, 1956, the shareholders of Texas Calgary approved the increase of its authorized stock to 10 million shares and the exchange of 6,215,928 of these shares for all of the stock of Petroleum Products. This exchange was consummated shortly thereafter and the 6,215,928 shares were issued as follows:

| Shareholder | Shares |
|---|---|
| Ray McGlothlin | 5, 838, 664. 7 |
| Ray McGlothlin, Jr | 63, 165. 6 |
| Ray McGlothlin, Jr., trustee for Hal McGlothlin | 63, 165. 6 |
| Jack McGlothlin | 63, 165. 6 |
| Kay McGlothlin | 22, 497. 3 |
| Joyce McGlothlin | 22, 497. 3 |
| Vernon King | 56, 243. 7 |
| Massachusetts Mutual Life Insurance Co | 86, 528. 2 |

After the exchange, Petroleum Products was merged into Texas Calgary. On January 26, 1956, petitioner assumed the presidency of Texas Calgary and was elected to its board of directors. Petitioner served as president until December 11, 1956, and later served again as president from December 12, 1957, until April 10, 1959. Seligman served as chairman of the board of directors of Texas Calgary from January 26, 1956, to September 1959.

Texas Calgary started its efforts to sell the ranches immediately after the merger by listing them with real estate agents and by advertising in newspapers. On occasion, pressure was put on the real estate brokers to find buyers for the ranches.

The board of directors of Texas Calgary appointed a committee to evaluate the mineral potential of the ranches, and the committee reported that mineral value was negligible, whereupon the directors advised petitioner to press the sale of the ranches and that he was expected to perform on his guaranty agreement.

Petitioner was given official notification upon formal vote by the board of directors of Texas Calgary that he was required to perform on his guaranty agreement within 6 months after June 1, 1958. Increased efforts to sell the ranches resulted in the sale of the D'hanis ranch for $60 per acre in the fall of 1956. After the sale of the D'hanis ranch, the board of directors and individual directors advised petitioner that

they would demand satisfaction of the balance of his obligation on the ranch guaranty.

In 1958, shares of Texas Calgary stock were held by the public and were traded on the Toronto and American Stock Exchanges. When petitioner was called upon to satisfy his guaranty agreement, he did not then have sufficient cash to pay the difference between the book value of the ranches and the guaranty sum. In preparation for the arrangement of a satisfactory settlement on his guaranty agreement, petitioner negotiated the acquisition of all the stock in McWood Enterprises, Inc., a Delaware corporation (hereinafter referred to as Mc-Wood Enterprises). This acquisition was accomplished by securing the 25-percent interest therein owned by the Savings and Profit Sharing Pension Fund of Sears, Roebuck & Co. Employees (hereinafter referred to as the Sears, Roebuck Employees Fund) and by purchasing the remaining stock from McWood Enterprises. The acquisition of the McWood Enterprises stock from Sears, Roebuck Employees Fund took several weeks and required extensive negotiations. On December 18, 1958, petitioner proposed to the Texas Calgary board of directors an arrangement that was intended to satisfy his ranch guaranty agreement.

The details of the proposal by petitioner with respect to settlement of his ranch guaranty agreement with Texas Calgary were recorded in the "Minutes of a Special Meeting of the Board of Directors of Texas Calgary Company, Held on December 18, 1958," which are 13 pages in length. The pertinent portion of the minutes is as follows:

The Chairman then requested Ray McGlothlin to present his offer concerning the settlement and satisfaction of said Guaranty Agreement and the purchase of the remaining Ranch Properties. Mr. McGlothlin then summarized his proposal as follows:

(1) He would sell and deliver 10,000 shares of the capital stock of McWood Enterprises, Inc., a Delaware corporation, (being all of the outstanding stock of said corporation) unto the Company for his present cost basis in said stock_____ $85,779.00

(2) He would transfer and endorse, without recourse or warranty, the promissory Note of McWood Enterprises Inc. in the principal amount of $250,361.68, dated December 1, 1958, bearing interest at the rate of 6% per annum, containing the usual clauses, and being fully subordinated to another Note now owed by the said McWood Enterprises Inc. to The Savings and Profit Sharing Pension Fund of Sears, Roebuck & Co. Employees in the original principal sum of $850,000.00, unto the Company for his cost basis in said Note_____ 250,361.68

Total value of assets being transferred and sold unto Texas Calgary Company_____ 336,140.68
Less the total loss to be borne by McGlothlin under the terms of said Guaranty Agreement_____ 261,968.74

(3) He would accept the promissory Note of Texas Calgary Company dated December 22, 1958, bearing interest at the rate of 6% per annum, payable to his order on or before March 1, 1960, or on or before the date of the sale of the remaining Ranch Properties, whichever date passes first, containing the usual clauses, and in the principal amount of_____ $74,171.94

(4) He would then purchase the remaining Ranch Properties for $744,945.40 (which is deemed to be their Book Value as of December 15, 1958) upon the following terms and conditions and paying therefor as follows:

(a) He would pay cash into the Company in the amount of_____ 323,726.56

(b) He would assume the principal amount of the indebtednesses outstanding upon same as of the date of closing in the amount of____ 347,046.90

(c) He would declare the principal paid on the above-mentioned promissory Note of Texas Calgary Company, and upon receipt of the accrued interest, he would mark said Note "Paid and Cancelled" and deliver the same unto the Company_____ 74,171.94

Total purchase price of the remaining Ranch Properties_____ 744,945.40

(d) The Company would pay all taxes and insurance through December 31, 1958, and all interest to the date of closing.

(e) He would pay all taxes and insurance beginning January 1, 1959.

(f) He would receive a General Warranty Deed covering the remaining Ranch Properties subject only to the present grass lease outstanding on the Slator Ranch.

(g) He would receive possession of said properties on January 1, 1959.

(h) His said purchase of the Ranch Properties is subject to his obtaining loans from The Travellers Insurance Company in accordance with the loan commitments issued by Wm. B. Lupe & Company of December 16, 1958, reference to same being hereby made for all purposes.

(5) And upon the consummation of all of the above-mentioned transactions, he would receive and accept from the Company, a full and complete release from said Guaranty Agreement.

　　*　　　　*　　　　*　　　　*　　　　*　　　　*　　　　*

Upon the completion of said discussions, the Chairman stated that the matter should now be put to a vote. Thereupon on motion duly made and seconded, the following resolutions were unanimously adopted by those voting on same, to-wit:

RESOLVED: That the Chairman of the Board of Directors, the President, or any Vice President, and the Secretary, or any Assistant Secretary, of this corporation be, and each of them hereby is, authorized, empowered and directed, for and on behalf and in the name of this corporation:

(1) To immediately accept, from Ray McGlothlin, transfers and conveyances of all of the outstanding stock of McWood Enterprises Inc. (such stock having a value of $85,779.00) and the promissory Note of McWood Enterprises Inc. (such note being in the principal amount of $250,361.68), without recourse or warranty.

(2) To immediately execute and deliver the promissory Note of this Company (such Note being in the principal amount of $74,171.94, dated December

22, 1958, bearing interest at the rate of 6% per annum, payable on or before March 1, 1960, or on or before the date of the sale of the remaining Ranch Properties of the Company, whichever date passes first, and containing other usual clauses), in the form presented to this meeting, unto the said Ray McGlothlin;

(3) To sell the remaining Ranch Properties of the Company unto the said Ray McGlothlin upon the terms and conditions and for the considerations set forth in his above-mentioned proposal, such remaining ranch properties being described as follows:

(a) The "Slator Ranch" located in Webb and Zapata Counties, Texas, consisting of approximately 17,712 acres; and

(b) The "Crystal City Ranch" located in Dimmit and Zavala Counties, Texas, consisting of the Bleakley [sic] property containing approximately 8,367.16 acres, the Holdsworth Estate property containing approximately 5,112.6 acres, and the Winter Garden property containing approximately 750⅓ acres;

including all mineral and/or royalty interests of the Company in and to said properties and all equipment and personal property of the Company located upon or used in connection with all of said properties; and,

(4) Upon consummation of all of the transactions described in paragraphs (1) through (3) immediately above, to execute and deliver a release of the ranch Guaranty Agreement unto the said Ray McGlothlin so that he will stand fully released and forever discharged from all obligations and liabilities whatsoever contained in or arising out of same;

(5) To begin negotiations with The Savings and Profit Sharing Pension Fund of Sears, Roebuck & Co. Employees concerning the liquidation of McWood Enterprises Inc. into Texas Calgary Company; and

(6) To do all such further acts and things and to execute such further instruments that in the opinion of such officers may be necessary or appropriate to consummate all of the aforesaid transactions; * * *

Petitioner paid to Texas Calgary the sum of $261,968.74 on or about December 18, 1958, by conveying McWood Enterprises stock, having a cost basis to him of $85,779, and its promissory note having a face value of $250,361.68, and by accepting a Texas Calgary note in the amount of $74,171.94. The promissory note received by petitioner was made payable to Texas Calgary "on or before March 1, 1960, or on or before the date of the selling of the ranch properties of the company (such ranch properties being the 'Slator Ranch' and the 'Crystal City Ranch') whichever date passes first." Petitioner completed the acquisition of the Crystal City Ranch and Slator Ranch from Texas Calgary on January 27, 1959, for the remaining balance of $774,945.40, in accordance with the proposal accepted by the board of directors of Texas Calgary on December 18, 1958. On or about April 10, 1959, petitioner sold all of his Texas Calgary stock to Tom Slick and others and resigned from his position as president and director of Texas Calgary. Petitioner reported no cost basis in the Texas Calgary stock which he sold on April 10, 1959.

After resigning his offices with Texas Calgary, petitioner moved to the ranches and devoted his time to their management and operation. He repaired ranch fences, built barns, put in irrigation, and

made other general improvements. Petitioner brought a new road to the Crystal City Ranch and set up irrigation for 1,000 acres by laying a pipeline to a nearby gas well to power the well pump. The total cost of the improvements made by petitioner to the Crystal City Ranch was $61,001.98. Petitioner completed a water well on the Slator Ranch and piped it with a checkboard plastic watering system for watering cattle at 1-mile intervals, the cost for this project being at least $23,388.28. The Crystal City Ranch and the Slator Ranch were both sold at a profit within a single 2-week period late in 1961. Both ranches were sold for the asking price. The Slator Ranch was sold for $40 per acre to the owner of the land which surrounded it on two sides. The Crystal City Ranch was sold for $75 per acre to a Dallas oilman who was interested in an oil lease petitioner had made on the ranch. About 1 week after selling the Crystal City Ranch, petitioner purchased a 1,800-acre ranch adjacent to it for $48 an acre.

On his return for the taxable year ended May 31, 1959, petitioner claimed a deduction in the amount of $261,968.74 for "loss on ranch guaranty." With respect to this claimed deduction, respondent determined in the statutory notice as follows: "(c) It is determined that you sustained no loss of $261,968.74 as claimed by you in your income tax return for the taxable year ended May 31, 1959."

OPINION

It is petitioner's contention that the payment of $261,968.74 to Texas Calgary on or about December 18, 1958, resulted in a loss incurred in a transaction entered into for profit. Section 165(a), I.R.C. 1954,[1] allows a deduction for any loss sustained during the taxable year not compensated for by insurance or otherwise. In the case of an individual, the deduction is limited by section 165(c) (1) and (2)[2] to losses incurred in trade or business or losses incurred in any transaction entered into for profit although not connected with a trade or business. Petitioner contends that the payment in issue gave rise to a deductible loss within the meaning of section 165(c)(2). Respondent argues, however, that the transaction was not entered into for profit; that peti-

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.
SEC. 165. LOSSES.
(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
[2] SEC. 165. LOSSES.

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—
   (1) losses incurred in a trade or business;
   (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *

tioner's desire to acquire the listed securities was a personal matter; and that petitioner could at best hope that he would not sustain a loss in the transaction. We agree with respondent.

On their return for the taxable year ended May 31, 1959, petitioners claimed a deduction in the amount of $261,968.74 as a "ranch guaranty loss." In the statutory notice respondent determined that petitioners "sustained no loss of $261,968.74 as claimed."

On November 4, 1955, petitioner entered into an agreement for the exchange of his stock in Petroleum Products for stock in Texas Calgary. At that time, petitioner owned approximately 95 percent of the outstanding stock of Petroleum Products. As a result of that exchange and the subsequent merger of Petroleum Products with Texas Calgary, petitioner and other members of his immediate family acquired more than 80 percent of the outstanding capital stock of Texas Calgary. As a condition to the exchange of stock and subsequent merger of the two corporations, petitioner executed a guaranty agreement [3] whereby he guaranteed that in the event the three ranch properties acquired by Texas Calgary in the merger with Petroleum Products were not sold by January 15, 1958, for an amount not less than $1,098,-414.14, then Texas Calgary, upon 6 months' notice to petitioner, would receive full payment for such ranch properties. This agreement further provided that if the ranches were sold under any circumstances for a sum less than $1,098,414.14, then petitioner would have been obliged to pay the difference between the guaranteed sum of $1,098,-414.14 and the amount actually received for the ranch properties.

After the exchange of stock pursuant to the merger agreement, efforts were made by petitioner to dispose of the ranch properties for Texas Calgary. The record indicates that petitioner at all times attempted to obtain at least the guaranteed sum from any sale. On April 15, 1958, the board of directors of Texas Calgary gave petitioner 6 months' notice pursuant to the guaranty agreement. One of the ranches was sold in the fall of 1958. On December 18, 1958, petitioner offered in settlement and satisfaction of the guaranty agreement "and the purchase of the remaining ranch properties," to pay the principal sum of $1,006,914.14. Petitioner's offer was accepted by Texas Calgary on December 18, 1958. Pursuant to the agreement between the parties, petitioner paid Texas Calgary the sum of $261,968.74 shortly after the meeting of December 18, 1958. The balance of the sum re-

---

[3] Although the parties refer to petitioners' obligation as a "guaranty agreement," petitioner's agreement was actually one of indemnity. The terms "guaranty" and "indemnity" have distinct meanings although they are often used interchangeably. A guaranty is a secondary undertaking to pay the debt of another if the latter defaults. Performance by the guarantor creates a right by subrogation, against the primary debtor. An indemnity, on the other hand, is a primary undertaking which can create no rights to compensation against another. *Charles M. Howell,* 22 B.T.A. 140 (1931), affd. 69 F. 2d 446 (C.A. 8, 1934). In order to avoid confusion, however, we shall adopt the nomenclature used by the parties and refer to petitioner's indemnity agreement as the "guaranty agreement."

quired to obtain petitioner's release from the guaranty agreement was paid to Texas Calgary in January 1959.

On the one hand, petitioner contends that the guaranty agreement was executed by him at the time he acquired the Texas Calgary stock in order to obtain both a well-paying job and listed securities. On the other hand, petitioner contends that the payment on December 18, 1958, was not gratuitous, and that he did not receive any equivalent benefit.

Section 23(e)(2), I.R.C. 1939, which is substantially the same as present section 165(c)(2), was considered by this Court in *George F. Arata*, 31 T.C. 346 (1958), affirmed on this issue 277 F. 2d 576 (C.A. 2, 1960). In that case we held that a deduction is not allowable unless the expectation of profit was the taxpayer's prime motive for entering into the transaction, and that the burden is upon the taxpayer to prove such factor. See also *Helvering* v. *National Grocery Co.*, 304 U.S. 282, 289 (1938); *James E. Austin*, 35 T.C. 221 (1960), affd. 298 F. 2d 583 (C.A. 2, 1962). On the facts presented, we hold petitioner has not sustained that burden. The evidence is clear that petitioner executed the guaranty agreement because it was required by the existing board of directors of Texas Calgary as a condition to the merger, in order to protect the equity interest of the remaining shareholders of that company. However, a deduction under section 165(c)(2) is not allowed unless the taxpayer *personally* expected to profit from the transaction. The fact that profit therefrom might be or was intended to be realized by another is not sufficient. *George F. Arata, supra.*

Petitioner testified that one of the reasons for executing the guaranty agreement was that the deal would have fallen through without the agreement. Petitioner testified, with remarkable candor, that the "pressing motive" for the merger was his desire to obtain Texas Calgary stock, which would be listed on the American Stock Exchange, and would be sold by petitioner in order to obtain the cash required to retire an overdue note obligation. This account of his motivation is clearly consistent with what we believe to be petitioner's primary intent in executing the guaranty agreement, the acquisition of Texas Calgary stock. The payment in question, rather than being a deductible loss pursuant to section 165(c)(2), is more properly a cost of acquiring the Texas Calgary stock.

A transaction or expenditure by a stockholder which may benefit a corporation directly and will indirectly benefit the stockholder through the enhancement of the value of his stock and the increase of dividends on the stock is only of indirect benefit to the stockholder and is not a transaction for profit. *United States* v. *Keeler*, 308 F. 2d 424 (C.A. 9, 1962). *Pierre S. DuPont*, 37 B.T.A. 1198 (1938), affd. 118 F. 2d 544 (C.A. 3, 1941); *Frank G. Hogan*, 35 B.T.A. 26 (1936).

In the instant case, it is difficult to see how the guaranty agreement could possibly inure to petitioner's financial benefit, except by the enhancement of the value of his Texas Calgary stock, which would necessarily be more than offset by the expense incurred by him personally in fulfilling his guaranty obligation. We agree with respondent that the most petitioner could hope for would be not to sustain a loss on the guaranty.

The guaranty agreement was not only executed contemporaneously with the merger, it was in fact a critical condition necessary for the acquisition of Texas Calgary stock by petitioner. It has been held in a number of cases that expenses incident to the organization or reorganization, or merger of corporations are capital expenditures which may not be deducted from gross income as business expenses of the taxable year when paid or incurred. *Odorono Co.*, 26 B.T.A. 1355 (1932).

Petitioner relies upon *Marjorie Fleming Lloyd-Smith*, 40 B.T.A. 214 (1939), affd. 116 F. 2d 642 (C.A. 2, 1941). In that case the loss was the result of the taxpayer's payment of a substantial portion of the expenses of a bondholders' committee and certain legal expenses, all of which were incurred to reduce the taxpayer's direct liability as a guarantor of certain bonds issued by a corporation with which she was heavily involved. The Court allowed the deduction as a loss incurred in a transaction entered into for profit because the purpose for the payment of these expenses was to reduce the taxpayer's liability under the guaranty. The Court found as a fact in that case that the initial guaranty was a separate transaction, not made with the idea of either protecting or adding to the taxpayer's stock investment in the company. Furthermore, the Court found as a fact in that case, that the taxpayer's guaranty of the corporation's use of the funds thus secured would increase the value of her beneficial interest in the corporation's stock. Such a finding clearly distinguishes *Marjorie Fleming Lloyd-Smith* from the facts in this case. Here we have a guaranty agreement executed as a condition for the completion of the merger and the acquisition of stock, with no possibility that the guaranty would be reflected by a corresponding increase in his beneficial interest in Texas Calgary.

It is clear in the instant case that petitioner would not receive a release from the guaranty agreement until he paid the amount ($1,098,414.14) stipulated in paragraph 10 of the agreement dated November 4, 1955. Respondent contends that the proper method of reflecting the payment made on December 18, 1958, is to make an adjustment in either the cost basis of the two ranch properties purchased in January 1959, or alternatively, the cost basis of the Texas Calgary stock acquired in November 1955, and sold to Tom Slick in

January 1959. We believe, as stated above, that the guaranty agreement was a necessary step in the acquisition of Texas Calgary stock, and the cost of performance on this guaranty agreement (the payment of $261,968.74) should be reflected in an adjustment in the basis of the Texas Calgary stock. *Odorono Co., supra; W. D. Haden Co.* v. *Commissioner*, 165 F. 2d 588 (C.A. 5, 1948), affirming on this issue a Memorandum Opinion of this Court.

We hold that the payment is not properly deductible under section 165(c)(2). To reflect adjustments resulting from the change in the basis of Texas Calgary stock sold by petitioner in the taxable year 1959,

*Decision will be entered under Rule 50.*