Charles F. McCURDY, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 6579.

United States District Court,
S. D. Ohio, W. D.

Dec. 16, 1970.
On Motion for Directed Verdict
May 5, 1971.

William R. Hardy, Graydon, Head &
Ritchey, Cincinnati, Ohio, for plaintiff.

Lawrence J. Ross, U. S. Dept. of Justice, Tax Div., Washington, D. C., for
defendant.

SECOND PRETRIAL ORDER

HOGAN, District Judge.

At the pretrial two law issues and one
fact issue were severed. Since that time
a stipulation has been filed with respect
to the fact question (waiver) and there
has been filed on behalf of each of the
two parties an excellent brief dealing
with both the fact question and the law
question.

The briefs have been carefully examined, as have the authorities cited therein.

Briefly the taxpayer had, prior to 1960, invested (using the term in its street sense) some $85,000.00 in a Florida corporation. The company issued, as an original issue, notes and stocks on a 4-1 basis. In other words, it did not sell either its stock or its notes separately, but would only issue them in combination, so that on a $5.00 basis $4 went to buy notes and $1 went to buy stock. The plaintiff acquired notes for his $68,000.00 and stock for $17,000.00. While it appears that there were some 30 shareholders, plaintiff's investment apparently amounted to one-seventh of the company's issue of stock and notes.

The plaintiff, in filing his 1960 income tax return, in effect claimed that the company was so insolvent at the end of 1960 that neither his stock nor his notes was worth anything. On his return he took a bad debt deduction of $68,000.00 and a long-term capital loss of $8,500.00. On an examination by the Director, each of these items of deduction was totally disallowed. A 30-day letter so stating issued on October 3, 1963, and within the 30-day period, as extended, a protest was filed on February 3, 1964. The taxpayer's position in his protest was the same as in his return; that is to say, he claimed a business bad debt deduction in respect of the $68,000.00 item and a capital loss deduction in respect of the $17,000.00 item. Proceedings after the protest were handled, of course, by the Appellate Staff. The Appellate Staff of the I.R.S. is headed by chiefs who report to the Assistant Regional Commissioner. In the labyrinth of government, while both District Directors and Regional Appellate Staffs are part of the Internal Revenue Service, the Appellate Staff is clearly not a part of any District Director's organization. Some point is made of this in the briefs—however, from the point of view of the taxpayer, we have difficulty in separating, for purposes of any waiver question, what got into the file in the Director's office and in the Appellate Staff prior to the time a refund claim was filed and what got in afterwards. Surely one part of the Service is not devoted to keeping secrets from the other part; or stated otherwise, it would shock this Court if as a matter of fact it were ever questioned that the Service maintains one file in the secrecy of the Appellate Staff and another file in the secrecy of the Director's office until such time as these files might be consolidated either in the Tax Court or a district court.

The initial audit of this taxpayer's 1960 return was made by the District Director. The protest was addressed to and filed with the Director in February of 1964. While the 90-day letter issued from the Appellate Staff in May of 1965, the refund claim was addressed to the District Director and filed with him in October of 1965. A year later, in October of 1966, or thereabouts, a notice of disallowance issued by the appropriate governmental agency and it is inconceivable to this Court that during that year the filings with the Appellate Staff had not become a part of the file of the reviewing agency. It would be a sad state of affairs to even hypothesize that the reviewing agency did not read the file before it disallowed the claim. At least insofar as the waiver claim is concerned, this Court would consider that whatever claims were really involved included whatever claims were raised both on the face of the refund claim and/or were otherwise in the Internal Revenue Service's files.

Be that as it may, to return to the chronology, as has been indicated, the protest was filed in February of 1964. On its face the protest and the original return were fully consistent. During the proceedings before the Appellate Staff on this protest, considerable financial information was turned over to the conferee, as well as an appraisal. Somewhat toward the end of the proceedings before the Appellate Staff, and in April of 1965, a letter was addressed by the taxpayer to the Appellate Division indicating that while the taxpayer thought that the $68,000.00 debt was worthless and was a business bad debt,

as distinguished from a non-business bad debt, and further indicating that there was no question in his mind that the stock was worthless in 1960, nonetheless the taxpayer, who at this time only hinted of a claim of ordinary loss in respect of the stock, offered to settle on the basis of the bad debt loss being reduced from $68,000.00 to some $51,000.00 plus, and on the basis of the capital loss with respect to the $17,000.00 in stock be allowed as set forth in the return. The recited basis for the reduction from the $68,000.00 to the approximately $51,000.00 was that the various items which had been submitted indicate that the taxpayer could not have possibly realized on the debt more than some 24% thereof; wherein lies one intriguing question in this case—perhaps semantic, perhaps not. The problem is whether a claim of total loss reduced in negotiation to a claim for settlement purposes to a partial loss has introduced the question of partial loss into the refund record.

Again to return to the chronology, the 90-day letter issued in May of 1965. The taxes involved in the questions were paid in August of 1965 and amounted to some $38,000.00 plus interest. The refund claim was filed in October of 1965. In the refund claim it was the position of the taxpayer that the entire $68,000.00 deduction should have been allowed as a "business bad debt deduction" and then for the first time, at least clearly, the taxpayer made alternate claims in respect of the $17,000.00. One alternate was the position taken on the original return, i. e., capital loss. The other alternate was "ordinary and necessary business expense." Insofar as the verbiage of the debt matter was concerned in the refund claim, there is no question that it stated a claim based on "wholly worthless" in 1960. Neither subdivision of Section 166(a) was mentioned in so many words. In other words, the taxpayer claimed simply that the $68,000.00 represented a business bad debt which had become totally worthless, stating, "The taxpayer could hope to receive

nothing in the way of repayment on his $68,000.00 loan." No mention was made of 166(a) (1), nor was any mention made of 166(a) (2), nor had anything been said anywhere on this record about that part of 166(a) (2) dealing with "an amount * * * charged off within the taxable year." Compare the alternative treatment in the refund claim with respect to the stock above referred to, which also renders the question difficult.

The refund claim was disallowed in late 1966 and this action to recover the taxes involved was seasonably filed in 1967. The original complaint was in every respect consistent with the refund claim, i. e., the $68,000.00 was claimed as a business bad debt deduction which had become "totally worthless" and the $17,000.00 was treated in the alternatives mentioned. No claim was made in the original complaint of partial worthlessness or of any involvement of Section 166(a) (2). After pretrial an amended complaint was filed by leave in accordance with a pretrial order, reference to which is made and incorporated herein, in which for the very first time in this record the taxpayer claimed, in specificity with respect to the $68,000.00 item, that it was "partially worthless."

Section 166 provides in part (a), under the heading "General Rule," this:

"1) Wholly worthless debts—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

"2) Partially worthless debts—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

Section 7422 confines the jurisdiction of a district court to refund cases filed after "a claim for refund or credit has been duly filed with the secretary or his delegate, according to the provisions of law in that regard, and the regulations

of the Secretary." (And, of course, disallowance or time without action.)

The applicable regulations dealing with partial worthlessness—which regulations are unquestionably valid—provide:

"That if from all the surrounding attending circumstances the District Director is satisfied that a debt is partially worthless, the amount which has become worthless shall be allowed as a deduction under 166(a) (2), but only to the extent charged off during the taxable year."

And further,

"Before a taxpayer may deduct a debt in part he must be able to demonstrate to the satisfaction of the District Director the amount thereof which is worthless and the part thereof which has been charged off."

Of course, only a business bad debt may be the subject of a partial charge-off. The regulations respecting claims for refund, which also are unquestionably valid, provide:

"No refund will be allowed except upon one or more of the grounds set forth in a claim * * *. The claim must set forth in detail each ground upon which a refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof."

The problem is one of jurisdiction. The starting questions are whether the partial worthlessness claim was sufficiently stated in the refund claim and/or, if not, was it in effect waived and gone into. The parties are in agreement, on brief, that as a matter of fact not only did the Secretary or Director not regard the partial worthlessness as an issue before it was specifically raised in this case, but the parties are also in agreement that some things which the Service normally does in connection with a partial claim, e. g., such as an audit of the debtor, was not done in this case. There is no question at all of the fact that the Secretary has not in fact considered the partial worthlessness issue and has never made any

expression of whether he is "satisfied" or not, and to what extent, if any.

The problem is an interesting one in its rather involved context which we have outlined. One would be inclined to say that a claim for a dollar is a claim for any part of a dollar. There is certainly most respectable authority in this area to the contrary. See Mayer Tank Mfg. Co. v. Commissioner of Internal Revenue, 126 F.2d 588 (2nd Cir. 1942) and Lehman v. Commissioner of Internal Revenue, 129 F.2d 288 (2nd Cir. 1942). Whether the refund claimant is merely put to the task of setting forth all of his facts based on which he can switch from a legal basis stated in the refund claim to another legal basis has been decided pro or con, depending upon the specific situation in which it has arisen. For some cons, see Kentucky Rock Asphalt Co. v. Helburn, 108 F.2d 779 (6th Cir. 1940) and Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542 (1940). For what is asserted as a pro, see Ford v. United States, 402 F.2d 791 (6th Cir. 1968).

■■ This Court has concluded that these severed issues need not be decided at this time, but should await the jury trial of the other issues. The reason is this: 166(a) (2) undoubtedly extends discretion to the Secretary or his delegate. While in fact the discretion has not been exercised, since the matter was never considered, it is also true as a conclusory matter that if it would be determined that the partial question was raised or the deficiency waived, the Secretary conclusorily, of necessity, determined there was no partial worthlessness. The review of such a determination, made or presumed, is solely for an abuse of discretion and such a conclusion would not be interfered with unless plainly arbitrary or unreasonable. See Stranahan v. Commissioner of Internal Revenue, 42 F.2d 729 (6th Cir. 1930). In the view of this Court and with due respect to the District Court referred to in Patterson v. Pizitz, 353 F.2d 267 (5th Cir. 1965), such a review involves purely

questions of law and no question of fact for any jury. That being the case, the determinations of the severed issues will await the conclusion of the jury trial of this case. It is quite conceivable that the disposition by the jury of fact questions will render it unnecessary for this or any other court to decide the severed questions in this peculiar context. For example, if the jury on appropriate interrogatories would in effect determine the $68,000.00 item as a non-business item, it would go a long way toward ending the whole case; by the same token, if the jury decided that the $68,000.00 item was a business bad debt which was wholly worthless, that would go a long way. It will also be time enough then to consider whether, under whatever the circumstances may then be, and on this peculiar record, there should be any remand of the severed issues insofar as a fact determination is concerned.

### DECISION ON DEFENDANT'S MOTION FOR DIRECTED VERDICT ON TWO ISSUES ON WHICH RULING WAS RESERVED AT TRIAL (RULE 50–B)

HOGAN, District Judge.

This case was the subject of a five-day jury trial which ended on February 2, 1971, with the jury returning a Special Verdict on three of the four questions of "fact" posed by the pleadings and record. At the conclusion of all of the evidence, the defendant renewed a motion for a directed verdict. The motion, which was in writing and was fully briefed, dealt with each of the four issues separately. The defendant's position in respect of each issue was that the plaintiff had not produced sufficient evidence to warrant the submission of the issue to the jury; or, stated alternately, that the evidence plus any and all reasonable inferences left only a question of law. One issue, i. e., whether the stockholder Notes Payable owned by the plaintiff represented debt or equity, was, on agreement of the parties, withdrawn from the jury and submitted on all the evidence in this case to the Court —irrespective of whether the stated issue be one of fact or law.

A general description of this case is contained in a Second Pretrial Order of this Court entered December 16, 1970. That background is incorporated and will not be repeated herein.

The jury, with respect to the three issues submitted, decided:

1) That the plaintiff as an individual was engaged in a trade or business at the relevant times. (Issue 1)

2) That the purchase by the plaintiff of the securities was an integral and necessary part of his business. (Issue 2)

3) That at the end of the relevant year the securities were wholly worthless. (Issue 3)

Issue 3—the issue of total worthlessness —was fairly submitted to the jury and there was substantial evidence based upon which the jury could have arrived at the conclusion it did. The motion of the defendant for a directed verdict on Issue 3 is therefore overruled. So, there remains in this case no issue of partial worthlessness and no issue of abuse of discretion by the District Director (described in the aforesaid Pretrial Order).

The parties are agreed, on post-trial memos, that the issue of whether the Notes Payable owned by the taxpayer (which the jury found had become, along with the capital stock purchased by him, wholly worthless at the relevant time) represented debt or equity need not be decided if this Court should sustain the defendant's motion in respect of either Issue 1 or Issue 2. It is assumed, but of course not decided, that the $68,000.00 face amount of stockholder Notes Payable represented true debt and not equity.

The concrete questions are: Viewing all the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences thereupon, could a reasonable mind conclude—

a) that the plaintiff was in a trade or business

and/or

b) if so, were his purchases of stock and notes business or trade related under the applicable tests

—or—

stated otherwise, in this record was the plaintiff, as a matter of law, not so engaged; or, if he was, were the purchases not business related under the applicable tests.

In 1958 and 1959 the plaintiff exchanged a total of $85,000.00 for 170 shares of the common capital stock of a Florida corporation, called The Arnn Corporation, and four notes, the face value of which aggregated $68,000.00. This was done in four separate transactions, in each of which the plaintiff received both a note payable and a stock certificate. The allocation both by the taxpayer and the company was four to one, that is to say, $17,000.00 represented the purchase price of the stock and $68,000.00 represented the purchase price of the notes which in the aggregate had that face value.

The Arnn Corporation had been incorporated in 1957 in Florida. It was a closely held corporation and was so contemplated at its commencement. It was basically promoted by a golf professional from the Cleveland, Ohio, area. The plan was to develop a typical South Florida golf course-residential area. Something in excess of 1200 acress of land in Collyer County were to be purchased, a golf course and country club were to be installed and erected on the land and the surrounding acreage was to be plotted and developed for residential purposes. The initial cost of the land was approximately $600,000.00, which required a cash downpayment of approximately $100,000.00. In contemplation and in fact the cost of the golf course installation involved something in the neighborhood of an outlay of more than $100,-000.00 for machinery and equipment and approximately $300,000.00 for the construction and installation. The capital was raised on a personal solicitation basis. It eventually involved some approximately 30 people.[1] Approximately three were from the Cincinnati area and a somewhat greater number came from the Greater Cleveland area. The company had no hope of any income from any source, for any practical purpose, until the golf course had been completed, so that it was fairly obvious from the start that to "put this show on the road" was going to take something in the neighborhood of one-half million dollars. As a matter of plan —and this plan was adhered to throughout the history of this company insofar as it is involved here—the company would not issue or sell stock as a separate item, nor would it issue or sell as a separate item a "Note Payable-Stockholder" to anyone. Anyone interested in acquiring either stock or a "Note Payable-Stockholder" put up a given amount of money and in exchange therefor he received a "Note Payable-Stockholder" representing 4/5ths of what he put up and capital stock representing 1/5th of what he put up.

At the time the defense motion was originally presented, this Court expressed serious doubt whether the Government motion in respect of those two issues should not be granted. However, this case had then been tried for three whole days and, since the loss on the stock shares had been alternately claimed as a capital loss in the refund claim and was an issue in this case which had to go to a jury, the Court determined to send the other two issues as well, so that, if the issues should not have been withdrawn from a jury, the case might be disposed of finally in an appellate court without the necessity of another jury trial. A full reconsideration of the matter has lead to the conclusion that the motion for a directed verdict in favor of the defendant should

---

1. Plaintiff was a "minority" stock-note holder. In no sense of the word was he a controlling stockholder or noteholder.

have been granted on the two issues described.

■ There is simply no substantial evidence in this case based on which a reasonable mind could conclude that this plaintiff was in a trade or business as an individual either at the time the investments were made or at the time they became a loss in 1960. Nor is there any evidence in this case based on which a reasonable mind could come to the conclusion that the purchase by the plaintiff of the securities was a business related purchase as distinguished from an investment.[2] The evidence indicated that the plaintiff had been engaged, since 1926, in the general Cincinnati area as an individual in the contracting business up until the early 50's. His contracting business was limited to the installation of sewer and water lines. The plaintiff had done some business in Indiana, Kentucky, and Michigan within an area of some 150 miles from Cincinnati, as had his company. No business had ever been done either by the plaintiff or his company in or anywhere close to the Naples, Florida, area. In the early 50's, the plaintiff incorporated his business and since that time he has been the sole stockholder of that company, as well as the president of that company.[3] There is absolutely no evidence in this case that, between the time of the incorporation in the early 50's and up to and including 1960, the plaintiff ever bid as an individual on a single sewer or water main or any other construction job anywhere. Nor did the plaintiff as an individual, during that period, make any construction contract or do any construction work.

The plaintiff learned of this Arnn Corporation either through a brochure which indicated that the overall development by Arnn would involve substantial sewer and water line work, or through the golf professional who promoted the company. In either event, the plaintiff noted the possibility of the related work and that had something to do with his interest in the company. It is also true that two or three of the investors in this company expected to and did obtain business related contracts or associations resultant upon their investment; however, it is far from clear that the Arnn Company ever actually proposed to lay sewer and water lines in connection with the investment. While the brochure refers to an ample supply of water to each house, and while a water company was set up and some land transferred to it, the fact was that the development actually involved the use of wells per house or houses and septic tanks. But even if one would concede, as one must in the light of the jury verdict, that the Arnn Company had formed a firm plan of development which would have involved substantial work in water and sewer lines, there is absolutely no evidence that the plaintiff, at or prior to his investment, ever even discussed the matter of business with anyone in authority from the Arnn Company. The most that could be said of the plaintiff's position is contained in the refund claim in this case as follows:

"Taxpayer had contemplated his personally going into the business of contracting for the construction of water and sewer systems in the State of Florida."

While the refund claim continues, "It was understood and agreed between taxpayer, such other individuals and the shareholders and officers of the company that taxpayer would be given the right of first refusal on any contract," there is in this record no evidence whatever of that.

2. Minton v. Southern Ry., 368 F.2d 719 (6th Cir. 1966) a " * * * trial judge must view the evidence in the light most favorable to the plaintiff. * * * Only if reasonable minds could arrive at one conclusion and that in favor of the defendant should a verdict be directed."

3. Since 1926 plaintiff's sole occupation has been related to "sewer and water line" installing—prior to 1950 as an individual proprietor and since then as president and active executive of his own corporation.

The sole evidence of any individual business or trade engaged in by the plaintiff in this case was this: In 1958 and thereabouts, and for some time previous, the plaintiff owned some real estate which he leased to his controlled corporation and on which the controlled corporation stored its equipment. A rental was involved in that. In addition, in 1958 and thereabouts the plaintiff individually owned some heavy construction equipment which he individually rented to his corporation for its use. This might be some evidence that plaintiff was in the business of renting real estate or heavy equipment to a controlled company. It is no evidence at all that he, as an individual, was in the business of using that equipment (he did not use it).

The fact that the plaintiff was the owner and president of a corporation which engaged in the business of contracting does not put him in that contracting business as an individual. Whipple v. Commissioner of Internal Revenue, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963). The mere "contemplation" of entering a business is not a sufficient basis for a 26 U.S.C. § 166 business bad debt loss. See also Higgins v. Commissioner of Internal Revenue, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941); and United States v. Clark, 358 F.2d 892 (1st Cir. 1966). The Sixth Circuit has pointed out the importance of the corporate entity in a context of a claim of individual business in Sogg v. Commissioner, 9 T.C.M. 927 (1950), 194 F.2d 540 (1952). It is determined as a matter of law that, under the facts as described, construed most favorably to the plaintiff, the plaintiff was not, during 1958 and 1959, engaged in a trade or business—specifically, he was not, as an individual, in the construction business or the business of contracting for and installing sewer and water lines. A corporate entity for business purposes is a corporate entity for tax purposes—whether the section involved be an income or a deduction one.

Even though it be conceded that the plaintiff was in a trade or business, the issue of "business relationship" would remain. This Court agrees with plaintiff that the test of "business relationship" vis-a-vis a "debt loss" under § 166 is different from the test of "business relationship" under § 162 (26 U.S.C.)— at least it is stated differently.

*Section 162* "allows as a deduction"— "all the ordinary and necessary expenses * * * in carrying on any trade or business * * *."

*Section 166* "allows as a deduction" a debt which has become worthless if it was "created or acquired in connection with a trade or business" or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

This case departs from the usual reported decision in that in this case and at one time (substantively, for our purposes, if not temporally) the taxpayer, in one transaction, acquired securities with at least different names, i. e.,

the $68,000.00 Notes

and

the $17,000.00 Capital Stock.

The stock loss, of course, cannot be claimed under § 166 and the plaintiff, dedicated to the proposition that the Notes—Debts, must claim the deduction under § 166. (If the Notes represent equity [the Government's position on the severed and undecided issue] plaintiff could then only claim the Note loss under § 162, if at all, since it is contra the taxpayer's refund position.)

No effort was made by this Court to submit, or charge on, the variables—for obvious pragmatic reasons. The so-called "more stringent" question was charged on, submitted and answered in favor of the plaintiff. Pragmatics no longer dictates the "consolidating."

FIRST—the Stock and the § 162 question.

The law in this Circuit is settled in Steadman v. C. I. R., 424 F.2d 1

(1970). A taxpayer, engaged in a trade or business, who purchases stock in a new or existing separate corporation and thereafter claims that the purchase price was an "expense paid or incurred in carrying on" (§ 162) that trade or business must produce *some* evidence that the purchase was not only an integral but *necessary* act in the conduct of *his* business. (Emphasis ours—see *Steadman*, page 5.) The other leading cases in the field, both relied on in Steadman, are Corn Products Refining Co. v. C. I. R., 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955) and Booth Newspapers v. United States, 303 F.2d 916, 157 Ct.Cl. 886 (1962). We have examined those cases, as well as Waterman, Largen & Co. v. United States, 419 F.2d 845, 189 Ct.Cl. 364 (1969) and the many cases cited therein, with these conclusions:

a) *Common to the cases in which the* taxpayer successfully made the assertion is this: The purchase was made as a realistic necessity to solving a supply or market problem, or keeping some business or supplies that the taxpayer had, or recapturing some he had recently lost.

b) In the language of *Waterman*, at page 853—

"* * * when expansion is the underlying basis of the stock purchase, without any showing of *business necessity relating to the perpetuation of the life of an existing business*, the expenditure has been regarded to be in the nature of a capital investment rather than an ordinary and necessary business expense."

There is no evidence at all of any *need* which the individual business, if any, of the plaintiff had, nor any indication of any relationship between the stock purchase and a need—as to the stock purchase, the defense motion must be sustained. The verdict of the jury does establish that, with respect to the stock, plaintiff has sustained the alternative position of long-term capital loss.

SECOND—the Notes and the § 166 question.

The tests are variably stated. In *Whipple*, supra, the Supreme Court indicated the taxpayer must produce some evidence of proximate relationship (373 U.S. at page 201, 83 S.Ct. at page 1173):

"* * * It was designed to make full deductibility of a bad debt turn upon its proximate connection with activities which the tax laws recognized as a trade or business, a concept which falls far short of reaching every income or profit making activity."

That statement was adopted by the Sixth Circuit in Gustin v. C. I. R., 412 F.2d 803 (1969), as was this Congressional language:

"The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a nonbusiness debt * * *."

Several of the Circuits have adopted the test of "dominant and primary motivation" or "was business benefit a significant motivation," e. g., see Niblock v. Commissioner of Internal Revenue, 417 F.2d 1185 (7th Cir. 1969); Weddle v. Commissioner of Internal Revenue, 325 F.2d 849 (2nd Cir. 1963); United States v. Generes, 427 F.2d 279 (5th Cir. 1970). *Gustin*, supra, is, in our view, an expression of the "proximate relationship to the existing trade or business of the taxpayer."

The mixed question of law and fact—proximate v. remote—was squarely before the Court in United States v. Keeler, 308 F.2d 424 (9th Cir. 1962). The fact finder in that case, too, had found a "proximate business" relationship.

The facts in *Keeler* are considerably more favorable to the taxpayer than the facts in this case. It, too, was an expansion case. The Court said:

"However, taxpayer cites numerous cases wherein loans by a taxpayer were allowed to be charged off as business bad debts when they proved uncollectible, even when the taxpayer was not in the business of loaning money or promoting business enterprises, where it was found that such loans were essential to, or so proximately related to the business of the taxpayer that they could be said to have been made in connection with that business. The government concedes that the O'Neill rule, while determinative in the circumstances presented in that case, is not the sole criterion, and that if the loans bear a sufficiently direct relationship to taxpayer's business, they may qualify as business debts, even though the taxpayer's business is not that of loaning money or promoting business enterprises. But the government contends that a sufficiently direct, proximate relationship between this taxpayer's loans to Northern and his Seattle business is not shown by the evidence here to qualify such loans as business debts of the Seattle enterprise. With this last contention we must agree.

" * * * However, accepting, the claimed benefits to taxpayer's Seattle business at their face value, under the authorities they still would not establish a sufficiently close relationship between the taxpayer's loss on his loans to Northern and his Seattle business to warrant the deduction of those losses as business bad debts."

The authorities are exhaustively reviewed in *Keeler*. The Court held, as a matter of law, and despite the opposite conclusion by the fact finder, that the stronger facts there could amount, at the most, to only a remote and not a proximate relationship—something more than a "hope" for "added business" must be shown.

And so, in this case, there is no evidence at all that plaintiff was in the business of lending money or that he was in the business of lending money to non-controlled companies to obtain some of their business. He did expect to get a construction contract for either himself or his company and that *possibility* was discussed with his friends, some of whom afterwards actually did business with the Arnn Company. On the other hand—

1) At the most, the evidence indicated a possibility or an expectation, not confirmed by anyone in authority in advance.

2) An investment—stock—accompanied the acquisition of the debt.

3) The plaintiff's trade, at the very most, under the evidence most favorably construed, was renting land and equipment to a controlled company. There is no proximate nexus between *his* business and the loan. At best, the relationship was remote.

4) The loss bore no relationship to this plaintiff's trade.

For the reasons indicated, the defendant's motion for a directed verdict on Issues 1 and 2 is sustained.

Counsel are requested to prepare and submit a proposed judgment consistent herewith.