Charles F. McCURDY, Plaintiff-
Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 72-1063.

United States Court of Appeals,
Sixth Circuit.

Sept. 28, 1972.

Daniel B. Rosenbaum, Washington, D. C., for appellant; Scott P. Crampton, Asst. Atty. Gen., Daniel B. Rosenbaum, Meyer Rothwacks, Thomas L. Stapleton, Tax Div., Dept. of Justice, Washington, D. C., on brief; Wm. W. Milligan, U. S. Atty., Cincinnati, Ohio, of counsel.

Wm. R. Hardy, for appellee; Steven F. Williams, Graydon, Head & Ritchey, Cincinnati, Ohio, on brief.

Before WEICK, EDWARDS and CELEBREZZE, Circuit Judges.

EDWARDS, Circuit Judge.

This appeal involves a taxpayer's suit to recover taxes paid as a result of a re-determination of his taxes by the Commissioner of Internal Revenue. It was tried before a District Judge and jury in the Southern District of Ohio and resulted in a verdict in favor of the taxpayer in the sum of $22,826.57 for income taxes paid and interest due thereon for the taxable year of 1960.

The government appeals from that jury award. The United States contends that there was insufficient evidence at trial for the District Judge to have denied the government's motion for a directed verdict or to support the jury verdict which was entered. The government also contends that the District

Judge's instruction to the jury was in error.

The background of facts of this dispute are found in a post-trial opinion D.C., 328 F.Supp. 1068, of the District Judge:

"In 1958 and 1959 the plaintiff exchanged a total of $85,000.00 for 170 shares of the common capital stock of a Florida corporation, called the Arnn Corporation, and four notes, the face value of which aggregated $68,000.00. This was done in four separate transactions, in each of which the plaintiff received both a note payable and a stock certificate. The allocation both by the taxpayer and the company was four to one, that is to say, $17,000.00 represented the purchase price of the stock and $68,000.00 represented the purchase price of the notes which in the aggregate had that face value.

"The Arnn Corporation had been incorporated in 1957 in Florida. It was a closely held corporation and was so contemplated at its commencement. It was basically promoted by a golf professional from the Cleveland, Ohio, area. The plan was to develop a typical South Florida golf course-residential area. Something in excess of 1200 acres of land in Collyer County were to be purchased, a golf course and country club were to be installed and erected on the land and the surrounding acreage was to be plotted and developed for residential purposes. The initial cost of the land was approximately $600,000.00 which required a cash down payment of approximately $100,000.00. In contemplation and in fact the cost of the golf course installation involved something in the neighborhood of an outlay of more than $100,000.00 for machinery and equipment and approximately $300,000.00 for the construction and installation. The capital was raised on a personal solicitation basis. It eventually involved some approximately 30 people."

In dealing with an appeal from a jury verdict we are, of course, required to view the disputed facts from the point of view favorable to the prevailing party. Continental Ore Co. v. Union Carbide, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); 5A J. Moore, Federal Practice ¶ 50.08, at 2357 (2d ed. 1971).

The facts upon which appellee relies are set out in his brief as follows:

"Contrary to the plan of generating income from the sale of the land to finance the obligations of the corporation, Mr. Purola, the president, exhausted all resources on the construction of a golf course which was only a part of the development project. As early as June 1959, with no sales of land, it was apparent that a financial problem was faced by the corporation. Its president appointed a committee to find ways and means of meeting the corporation's obligations. On the same date, the president wrote to each shareholder advising them of the 'financial crises' confronting the corporation and requesting contributions of capital. Two weeks later, the president advised the stockholders that the corporation had received nothing by way of additional capital. At this same time, the taxpayer observed, among other things, that the project was 'practically at the dry rot state.' He added, 'I have thrown a considerable amount of money down a rat hole and I am wondering why I should stuff more in the hole.' This was in June of 1959. Four months later, the president, Mr. Purola noted, among many other things that he was personally carrying the corporation's payroll but that, with completion of roads and bridges, the sale of lots would progress rapidly. Such sales did not progress rapidly. By April of the following year (1960), not one lot had been sold. Two months later, Mr. Purola stated that the corporation was insolvent. If nothing was done to remedy the situation, he added, it would be necessary to liquidate. Within three weeks, Mr. Purola revealed that the corporation had accumu-

lated current liabilities of approximately $70,000; and that help was needed.

"Between the period that the corporation acquired the land and the date of Mr. Purola's request for help, June 22, 1960, a number of things had occurred which had altered the financial status of the corporation. Unable to pay its first installment of the mortgage ($135,333.33) in December 1958, the corporation granted a $100,000 second mortgage to the mortgagee and executed a note in the same amount, due December 19, 1962 with interest at 6 percent per annum. In December 1959, unable to make the second payment on the mortgage, the corporation granted a third mortgage to the mortgagee in the amount of $200,000 payable December 19, 1962 and secured by a note bearing 6 percent interest. At the same time, the corporation gave back to the mortgagee 80 acres of land with a pro-rated cost value of $32,000. Such was the financial posture of the corporation as the year 1960 unfolded. The golf course opened in January. It was evident to the taxpayer that the sale of lots was critical; and, as the year progressed, it was equally evident that progress during the coming 'winter season' was essential. '[I]t was a question of starting to plat all the lots and start sailing.'

"However, by the end of the fiscal year, the total value of lot sales by the corporation in 1960 was only $39,832. This was a gross figure which, reduced by direct cost, amounted to only $23,983.44. This 'net' figure, in addition, did not carry any allocation of the corporation's overhead or other expenses during the year which amounted to $41,583.39. Even the *gross* receipts were insufficient to pay the $135,333.33 mortgage installment due December 19th much less the accrued interest on the mortgage in the amount of $42,697.41 also due on the same date. Under these circumstances, the corporation agreed to pay to the mortgagee sixty percent of the selling price of all lots at the time of sale. From the remaining forty percent, the corporation would have to: (1) Meet its principal mortgage obligations; (2) pay interest on those obligations (amounting to $42,360 per annum); and (3) satisfy current liabilities which had doubled in five months to approximately $114,000 due, as of December 1960, in thirty days, not to mention continued development costs for which it had no funds. It was at this point that the taxpayer and his accountant concluded that the securities were worthless.

"The corporation *did* continue to sell lots in subsequent years; but the cost of those sales nearly equalled the income received, sixty percent of which could not be retained. In one year the cost of lot sales exceeded the income received. A consistent and increasing net loss was suffered by the corporation each succeeding year. In early 1963, the secretary of the corporation wrote to each of the security holders that 'the notes and obligations of the corporation cannot be met and same cannot be paid at any time in the foreseeable future.' Later the same year, a new mortgage was executed in the amount of $750,000 in favor of the Central States, Southeast and Southwest Areas Pension Fund of the Teamsters Organization. This mortgage provided that 66 and two-thirds percent of the sales price of each lot was to be paid to the mortgagee. Approximately five years later, the corporation found it necessary to enter into an escrow arrangement under Florida law for the liquidation of its assets for the benefit of its creditors."

Appellee's "securities" consisted of $17,000 worth of Arnn Corporation stock and $68,000 of notes payable in five years at six per cent.

Throughout this record (and we fear in the jury verdict) there appears to be confusion between whether the company

was in a profitable position and whether or not the securities (stock plus notes) were "worthless." Obviously, in 1960 the company was not in a profitable position. There is not, however, a scintilla of evidence that in 1960 or any other year that the $68,000 worth of notes were "worthless."

The Arnn Corporation balance sheet of September 30, 1960, showed assets in the sum of almost a half million dollars, sufficient to cover the notes payable to stockholders, of which McCurdy held four notes totalling $68,000. It also showed a balance of $59,158.75 in the shareholders' equity account.

### ASSETS

**OTHER ASSETS**

| | | | |
|---|---|---|---|
| Deposit | | | $ 500.00 |

**PERMANENT ASSETS**

| | | | |
|---|---|---|---|
| Land — per schedule attached — Note A | | $747,036.37 | |
| Golf course — per schedule attached | | 333,783.23 | |
| Fairway watering system | $ 41,807.62 | | |
| Machinery and equipment | 120,551.46 | | |
| Building | 9,234.31 | | |
| Auto and trucks | 8,007.47 | | |
| | $179,600.86 | | |
| Less allowances for depreciation | 45,990.31 | 133,610.55 | 1,214,430.15 |

**DEFERRED CHARGE**

| | | | |
|---|---|---|---|
| Prepaid insurance | | | 3,401.07 |
| | | | $1,218,331.22 |

### LIABILITIES AND SHAREHOLDERS' EQUITY

**CURRENT LIABILITIES**

| | | | |
|---|---|---|---|
| Bank overdraft | | | $ 4,139.89 |
| Accounts payable — trade | | | 36,621.62 |
| Accounts payable — other | | | 16,344.18 |
| Note payable — supply purchases | $ 19,768.82 | | |
| Notes payable — Equipment purchases | 17,137.10 | | |
| Note payable — Bank of Naples | 477.50 | | 37,383.42 |
| Land contract payable — current portion | | | 135,333.33 |
| Accrued interest — mortgage | $ 22,436.94 | | |
| Accrued interest — stockholders | 49,365.69 | | 71,802.63 |
| Payroll and withheld taxes | | | 702.74 |
| TOTAL CURRENT LIABILITIES | | | $ 302,327.81 |

**LONG-TERM DEBT**

| | | | |
|---|---|---|---|
| Land contract payable | $494,897.99 | | |
| Less portion classified as current liability | 135,333.33 | $359,564.66 | |
| Notes payable — stockholders | | 497,280.00 | 856,844.66 |

**SHAREHOLDERS' EQUITY**

| | | | |
|---|---|---|---|
| Capital stock | | $124,520.00 | |
| Capital surplus deficit balance December 1, 1959 | $ 55,559.70 | | |
| Add net loss for the period from December 1, 1959 to September 30, 1960 | 9,801.55 | 65,361.25 | 59,158.75 |
| | | | $1,218,331.22 |

Note A — Land is being purchased under a land contract agreement. A small portion has been deeded as of the balance sheet date.

We do not imply, of course, that this unaudited corporation balance sheet is invulnerable to attack. Appellee could have produced expert testimony to show that the land, or the golf course and its equipment, or both were overvalued. Appellee's principal problem on this appeal is that he did not do so.

We recognize that he did call as a witness his personal accountant, a CPA with offices in Cincinnati. The accountant testified that in his judgment $300,000 worth of notes given to the mortgageholder by The Arnn Corporation for deferring payments due on the mortgage by Arnn, plus $64,000 of interest paid, should not have been added to the cost of the land so as to increase its value as shown on the corporation balance sheets. The accountant did not, however, say that this $364,000 should not be listed as a corporate asset, and he did not attempt to express an opinion as to the actual value of the Arnn Corporation land or golf course.

The accountant's basic reason for asserting that McCurdy's stock and notes in Arnn were worthless was that the cash position of the company was such as to make the mortgageholders' foreclosure of the land both immediate and inevitable.

Actually, however, even if the $364,000 were deducted entirely from the Arnn Corporation's assets as of 1960, such deduction would wipe out the shareholders' equity but it would still leave significant book value for the notes payable to stockholders. The $300,000 in notes had, of course, been given the mortgageholder by Arnn for the purpose of postponing the possibility of foreclosure well beyond 1960.

This record discloses without dispute that the Arnn Corporation continued to do business for eight more years during which it sold over three-quarters of a million dollars worth of lots. In 1963 Arnn refinanced its mortgage loan by securing a new mortgage of $750,000, with which it paid off the original mortgage. In 1964 McCurdy filed suit against the Arnn Corporation and recovered a judgment for his notes and back interest thereon for $91,318.96. In 1968 he received a distribution of $12,087 from the corporation assets in partial satisfaction of his judgment. It was not until 1969 that The Arnn Corporation ceased to do business and assigned its assets to an escrow agent for the benefit of creditors. The corporation attorney estimated that McCurdy will recover a minimum of $49,000 more against his claims.

The notes in this case which accounted for $68,000 of the taxpayer's loss taken in the tax year 1960 have been held by the District Court to be nonbusiness debts. No issue pertaining to that decision is before us. Allowance for deduction of nonbusiness bed debt losses is governed by the statute and regulation which follow:

"SEC. 166 Bad debts.

\*   \*   \*   \*   \*   \*

(d) Nonbusiness debts.—

(1) General rule.—In the case of a taxpayer other than a corporation—

(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months." Int.Rev.Code of 1954, § 166.

"§ 1.166–5 *Nonbusiness debts*.

(a) Allowance of deduction as capital loss. \* \* \*

(2) If, in the case of a taxpayer other than a corporation, a nonbusiness debt becomes wholly worthless within the taxable year, the loss resulting therefrom shall be treated as a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months." Treas.Reg. § 166–5 (1954).

■ The record in this case seems to us to disclose no evidence which could justify this jury's special verdict to the extent that it held these notes were "wholly worthless" in 1960. *Cf.* United States v. S. S. White Dental Manufacturing Co., 274 U.S. 398, 401, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). Either the government's motion for a directed verdict at the close of plaintiff's proofs or its motion for verdict non obstante veredicto should have been granted as to the notes in question.

While from this written record alone we would not decide the question of the worthlessness of the stock as of 1960 in the way the jury did, we believe that McCurdy's accountant's testimony represented evidence from which the jury could have found the stock to be worthless.

The Second Circuit has stated the test of worthlessness of a stock as follows:

The common stock of a corporation has no value when its assets fairly appraised are less than its liabilities except when there is a reasonable prospect of improved conditions which will bring about the reverse. That is a question which must be decided in each instance upon the peculiar circumstances shown. Thompson v. Commissioner of Internal Revenue, 115 F.2d 661, 662 (2d Cir. 1940).

*See also* Huston v. United States, 96 F. Supp. 999, 1003 (W.D.Pa.1951).

■ We believe that the jury had competent evidence before it from which it could have concluded that The Arnn Corporation stock was worthless in 1960 under the terms of this test.

On consideration of the Judge's charge taken as a whole, we find no reversible error as to this aspect of this appeal.

The decision of the District Court is affirmed in part and reversed in part. The judgment is vacated and the case is remanded for recomputation of the judgment, based upon recovery of the taxes paid on the $17,000 of stock, and interest thereon.